UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
CLIFFORD A. LOWE, *et al.*,  :
:  Case No. 1:19-cv-748
    Plaintiff-Counterdefendants,  :
vs.  :  OPINION & ORDER
:  [Resolving Doc. 68]
SHIELDMARK, INC., *et al.*,  :
:
    Defendants-Counterplaintiffs.  :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this patent case, Plaintiffs sued Defendants for infringing Plaintiffs' floor marking tape patent, U.S. Patent No. 10,214,664 ("the '664 Patent").[1] Defendants, in turn, have filed a counterclaim against Plaintiffs for infringing Defendants' own floor marking tape patent U.S. Patent No. 10,738,220 ("the '220 Patent").[2]

After the parties submitted claim construction briefing, the Court held a *Markman* hearing on March 18, 2021.[3] The Court sets forth its *Markman* findings below.

I.    BACKGROUND

The parties sell floor marking tape, a product used in industrial and commercial environments. Given this rough product use setting, floor marking tapes are often torn, broken, or unintentionally removed from the floors they are applied to.

The parties each hold floor marking tape patents designed to address different aspects of this problem:

Plaintiffs hold the '664 Patent, describing a floor marking tape incorporating a "shoulder" structure intended to "prevent[ ] the [tape] adhesive" that binds the tape to the

---

[1] Doc. 44.
[2] Doc. 46.
[3] Doc. 64.

Case No. 1:19-cv-748
Gwin, J.

floor "from flowing out to the outer edge of the tape," causing the tape to peel up—or become "delaminate[d]"—from the ground.[4]

Plaintiffs' tape's "shoulder" structure "defines a recess that holds the bulk of the adhesive" that binds the tape to the ground.[5] The marking tape invention also employs "tapered," or "beveled" edges designed to further "limit unintentional lifting and delamination of the tape from the floor."[6] Plaintiffs sell their floor marking tape product under the name "Superior Mark."[7]

Defendants own the '220 Patent, describing "a polymeric adhesive tape" with "superior ductility, strength, tear resistance and abrasion resistance" by "employing the sum or all of the combination of polymer selected, Shore A hardness, textured surface, and layer thickness."[8] Defendants sell their floor marking tape under the name "Mighty Line."[9]

On April 4, 2019, Plaintiffs sued Defendants, claiming that Defendants' sale of their "Mighty Line" product infringes Plaintiffs' '664 patent.[10] On May 28, 2019, Defendants filed counterclaims requesting that this Court find Plaintiffs' '664 patent invalid or unenforceable, or, alternatively, that Defendants were not infringing the '664 patent.[11]

On August 21, 2019, while the case was still in the pleading stage, Defendant Shieldmark petitioned the U.S. Patent and Trademark Office Patent Trial and Appeal Board

---

[4] Doc. 53-2 at 2:31–32.
[5] *Id.* at 1:57.
[6] *Id.* at 1:48–49.
[7] Doc. 42 at 31.
[8] Doc. 54-2 at 1:36–37; 2:37–39.
[9] Doc. 44 at 3.
[10] Doc. 1.
[11] Doc. 13.

Case No. 1:19-cv-748
Gwin, J.

for post-grant review of Plaintiffs' '664 patent.[12] Shieldmark requested, and this Court granted, a litigation stay until the Trial and Appeal Board decided Shieldmark's petition.[13]

On March 9, 2020, the Patent Trial and Appeal Board denied Defendant Shieldmark's post-grant review petition.[14] Shieldmark requested rehearing,[15] that the Trial and Appeal Board also denied on September 4, 2020.[16]

On October 13, 2020, after a status conference with the parties, the Court lifted the post-grant review stay, and the proceedings in this case resumed.[17]

Relatedly, while the case was stayed, the U.S. Patent and Trademark Office issued Defendants' '220 Patent on August 11, 2020.[18] On October 13, 2020, Defendants filed amended counterclaims against Plaintiffs, now claiming that Plaintiffs' "Superior Mark" floor marking tape product infringes Defendants' newly issued '220 patent.[19] The '220 Patent claims an earlier effective date than the Plaintiffs' '664 Patent.[20] On October 27, 2020, Plaintiffs amended their complaint, requesting invalidity, unenforceability, and non-infringement findings with respect to Defendants' '220 patent.[21]

With the dueling floor marking tape patent backdrop now set, the parties narrowed their interpretive dispute regarding the '664 and '220 patents to nine terms—eight from the '664 Patent and one from the '220 Patent.

---

[12] Doc. 30-1.
[13] Doc. 28; Doc. 31.
[14] Doc. 53-1.
[15] Doc. 35.
[16] Doc. 38.
[17] Doc. 40; Doc. 41.
[18] Doc. 42 at 31.
[19] *Id.*
[20] *Id.*
[21] Doc. 44 at 14.

-3-

Case No. 1:19-cv-748
Gwin, J.

Regarding the '664 Patent, the parties dispute the following terms:

1. Lateral edge portion;

2. Central body portion;

3. Coplanar;

4. Tapered;

5. Smoothly tapered;

6. Smoothly curved

7. Unintentional lifting;

8. ASTM D523 gloss test;[22]

Regarding the '220 Patent, the parties dispute only the meaning of "modified PSTC-101 test method."[23]

On March 18, 2021, the Court held a *Markman* claim construction hearing.[24] The parties have filed a joint claim construction and pre-hearing statement,[25] as well as opening and responsive claim construction briefs.[26] Following the *Markman* hearing, Plaintiffs moved to supplement the joint claim construction and pre-hearing statement.[27] Defendants oppose.[28] The Court **GRANTS** Plaintiffs' motion and considers the supplement in reaching the below claim construction findings.

II.     LEGAL STANDARD

---

[22] Doc. 53; Doc. 54.
[23] *Id.*
[24] Doc. 64.
[25] Doc. 61.
[26] Doc. 53; Doc. 54; Doc. 57; Doc. 60.
[27] Doc. 68.
[28] Doc. 72.

-4-

Case No. 1:19-cv-748
Gwin, J.

The construction of a patent, including terms of art used within its claims, is a question of law.[29] When interpreting a disputed claim term, the Court first looks to the intrinsic record evidence—the patent itself, specifically, the patent claims, the specification and, if in evidence, the prosecution history.[30] The intrinsic evidence gives the most significant guidance regarding the interpretation of disputed claim language.[31]

In *Phillips v. AWH Corp.*,[32] the Federal Circuit reiterated the standards used to interpret patent claims. Among these, a "'bedrock principle' of patent law [is] that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"[33] Thus, "the claims are 'of primary importance, in the effort to ascertain precisely what it is that is patented.'"[34]

The claims, however, should not be read in isolation but "must be read in view of the specification, of which they are a part."[35] Thus, after considering the claim language, the Court must next look to the specifications.[36] The specification is "always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term."[37]

---

[29] *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 383–91 (1996).
[30] *Personalized Media Communications, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed Cir. 2020).
[31] *Id.*
[32] *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).
[33] *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).
[34] *Phillips*, 415 F.3d at 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).
[35] *Id.* at 1315 (internal citation omitted).
[36] *Personalized Media Communications, LLC*, 952 F.3d at 1340.
[37] *Phillips*, 415 F.3d at 1315 (internal citation omitted).

-5-

Case No. 1:19-cv-748
Gwin, J.

The terms of a claim "are generally given [the] ordinary and customary meaning . . . that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention."[38] Courts thus interpret claims through the eyes of a person having ordinary skill in the art or field of invention. That person "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field."[39]

### III. ANALYSIS

Because the disputed terms here repeatedly refer to one another, exploration of one term's meaning requires some understanding of the others.

As set forth in the written specifications, the '664 Patent describes a floor marking tape incorporating a "shoulder" structure intended to "prevent [tape] adhesive from flowing out past the lateral edges of [the] tape," causing the tape to become delaminated from the ground.[40] The tape's "shoulder" structure "defines a recess that holds the bulk of the adhesive" that keeps the tape stuck to the ground.[41] The marking tape invention also employs "tapered," or "beveled" edges designed to "limit unintentional lifting and delamination of the tape from the floor."[42]

---

[38] *Id.* at 1312–13.
[39] *Id.* at 1313.
[40] Doc. 53-2 at 2:31–32.
[41] *Id.* at 1:57.
[42] *Id.* at 1:48–49.

-6-

Case No. 1:19-cv-748
Gwin, J.

The Court believes that the following '664 Patent specification images helpfully illustrate the disputed terms of the claimed invention:





The '664 Patent's independent claims 1 and 11 require "a floor marking tape adhered to a floor."[43] Figure 1 above depicts the entire tape body, while Figure 3 depicts the mirror-image ends of the tape body.

As depicted in the drawings above:

> Tape **10** is used to mark areas of a floor **12** such as the areas around machines or aisles from forklifts. Tape **10** generally includes a body **20** having an upper

---

[43] *Id.* at 5:2; 6:1.

-7-

Case No. 1:19-cv-748
Gwin, J.

> surface 22 and a lower surface 24. At least the lateral edges of upper surface 22 are smoothly beveled . . .[44]
>
> Lower surface 24 defines a recess 30 bounded by a pair of shoulders 32. Recess 30 may be centered with respect to body 20. Recess 30 is designed to receive the adhesive 34 that holds tape 10 to floor 12. Shoulders 32 prevent adhesive 34 from flowing out past the lateral edges of tape 10.[45]

With this background information in mind, the Court examines each of the disputed patent terms in turn.

### A. Lateral Edge Portion

First, the parties dispute the meaning of the term "lateral edge portion" in the claim 1 language requiring "the lower surface of each lateral edge portion [to be] a flat coplanar extension of the lower surface of the [tape] body."[46]

Plaintiffs argue that "lateral edge portion" in claim 1 means "a portion of the tapered edges of the tape body."[47] Defendants, by contrast, argue that the "lateral edge portion" in this context is "the portion of the floor marking tape from the shoulder to the edge of the tape when viewed in cross section."[48]

The Court does not believe Plaintiffs' reference to "a portion" of the tape body sufficiently describes the disputed term. While Plaintiffs are correct that the term "shoulder" is not present in the '664 Patent's claims, the term appears repeatedly in the patent specifications. Most notably, the specifications state that "[l]ower surface 24 defines a recess 30 bounded by a pair of shoulders 32."[49]

---

[44] *Id.* at 2:21–25.
[45] *Id.* at 2:28–32.
[46] *Id.* at 5:25–26.
[47] Doc. 53 at 21; Doc. 54 at 10.
[48] *Id.*
[49] Doc. 53-2 at 2:28–29.

-8-

Case No. 1:19-cv-748
Gwin, J.

The drawings above depict the shoulders lying in a vertical plane with the beginning of the floor marking tape's tapered edges, which converge until they meet at the pointed junction at the very end of the tape's sides.

The Court finds that the "shoulder" specification term is "highly relevant to the claim construction analysis"[50] of the term "lateral edge portion." In fact, without reference to the "shoulder" term, Plaintiffs' "lateral edge portion" definition is overly vague, as there is no clear demarcation point between the lateral edge portions and the rest of the tape body.

The Court accordingly adopts Defendants' proposed lateral edge portion definition as "the portion of the floor marking tape from the shoulder to the edge of the tape when viewed in cross section."

### B. Central Body Portion

The above analysis is helpful to resolving the parties' second dispute—the meaning of the term "central body portion" in the '664 Patent claim 10 and 20 language describing a floor marking tape adhered to a floor, where "the [tape] body has a central body portion disposed between the first and second lateral edge portions."[51]

Plaintiffs suggest the "central body portion" is "the portion of the tape body that extends along on each side of the body's centerline."[52] Defendants, by contrast, propose that the term means the "portion of the tape body between the shoulders of the two lateral edge portions."[53]

---

[50] *Phillips*, 415 F.3d at 1315 (internal citation omitted).
[51] Doc. 53-2 at 5:62–63; 6:62–63.
[52] Doc. 53 at 28; Doc 54 at 16.
[53] *Id.*

-9-

Case No. 1:19-cv-748
Gwin, J.

For the reasons just described in construing the term "lateral edge portion," the Court finds that Plaintiffs' proposed "central body portion" definition is overly vague. Without reference to the "shoulder" structure of the tape body repeatedly mentioned in the '664 Patent specifications, there is no clear demarcation point between the lateral edge and the central body portions of the floor marking tape.

The Court accordingly adopts Defendants' "central body portion" definition, meaning "the portion of the tape body between the shoulders of the two lateral edge portions."[54]

### C. Coplanar

Third, the parties dispute the meaning of the term "coplanar" in the '664 Patent claim 1 language requiring "the lower surface of each lateral edge portion [to be] a flat coplanar extension of the lower surface of the body."[55]

Plaintiffs argue that "the bottom surface of the lateral edge portions are flat, lie in the same plane, and define an extension of the lower surface of the body."[56] Defendants, on the other hand, argue that "a planar relationship" exists "between two or more things" and "does not allow the entire lower surface of the tape body to be one flat or planar surface."[57]

The Court finds Plaintiffs' argument that the whole bottom surface of the tape body is flat untenable. First, the Court does not believe that the plain claim language describing the bottom surface of the lateral edge portions as "flat coplanar extension[s]" of the tape body is consistent with the entire tape body having a single flat lower surface. Viewing a continuous horizontal line, an ordinary speaker would not describe one arbitrary portion of the line as

---

[54] *Id.*
[55] Doc. 53-2 at 5:25–26.
[56] Doc. 53 at 22; Doc. 54 at 12.
[57] *Id.*

-10-

Case No. 1:19-cv-748
Gwin, J.

a "flat coplanar extension" of another portion. A "coplanar extension" necessarily implies a reference to two distinct points that a continuous flat surface does not have.

But even if the claim language were ambiguous, the Court believes that the specification language also weighs heavily against Plaintiffs' proposed construction. As explained above, the '664 Patent specifications describe "a Lower surface **24** [that] defines a recess **30** bounded by a pair of shoulders **32**."[58] The "[s]houlders **32** prevent adhesive **34** from flowing out past the lateral edges of tape **10**."[59]

If the bottom surface of the tape were flat as Plaintiffs propose, there would be no "recess" to contain the adhesive and prevent the adhesive from flowing past the tape edges. The Court accordingly finds, as the Patent Trial and Appeal Board did, that the term "coplanar," in the '664 Patent does not allow the lower surfaces of the tape body and lateral edge portions to form a continuous flat line.[60] The Court adopts Defendants' proposed "coplanar" construction.

### D. Tapered

The parties next dispute the meaning of the term "tapered" in the claim 1 language requiring "the entire body of each lateral edge portion [to be] tapered with the upper surface of the first lateral edge portion extending to the lower surface of the first lateral edge portion and the upper surface of the second lateral edge portion extending to the lower surface of the second lateral edge portion."[61]

---

[58] Doc. 53-2 at 2:28–29.
[59] *Id.* at 2:31–32.
[60] Doc. 53-1 at 18–19.
[61] Doc. 53-2 at 5:27–32.

-11-

Case No. 1:19-cv-748
Gwin, J.

Plaintiffs' propose that the term "tapered" means "to become smaller or thinner toward one end with no areas of substantially uniform thickness."[62] Defendants propose a similar, but simpler, construction, where tapered means "to become[s] smaller or thinner toward one end" without the substantially uniform thickness requirement.[63]

Just as Defendants suggest, the term "tapered" colloquially means "to become smaller or thinner toward one end."[64] The Court finds no basis in ordinary language or in the '664 Patent claim or specification language to use Plaintiffs' proposed substantially uniform thickness requirement. The Court accordingly adopts Defendants' simpler definition of the term "tapered."[65]

### E. Smoothly Tapered

The parties similarly dispute the term "smoothly tapered" contained in the '664 Patent claim 5 and 15 language providing that "the upper surface of the lateral edge portions are smoothly tapered."[66] Plaintiffs propose that "smoothly tapered" means "tapered without projections or unevenness."[67] Defendants, on the other hand, propose that the term means "to become smaller or thinner toward one end without roughness."[68]

The Court believes that Plaintiffs' definition hits the mark. Notably, the Court is not construing the term "smooth" when used as an adjective. Rather, the Court construes the

---

[62] Doc. 53 at 17; Doc. 54 at 9.
[63] *Id.*
[64] *Tapered*, Dictionary.com, https://www.dictionary.com/browse/taper (last visited May 19, 2021).
[65] Doc. 53 at 17; Doc. 54 at 9.
[66] Doc. 53-2 at 5:46–47; 6:46–47.
[67] Doc. 53 at 28; Doc. 54 at 15.
[68] *Id.*

Case No. 1:19-cv-748
Gwin, J.

term "smoothly" used as an adverb modifying the term "tapered." The term "tapered" geometrically describes an object that becomes smaller or thinner toward one end.

When modified by the adverb "smoothly," which ordinarily means "free from projections or unevenness of surface,"[69] the Court believes that a tapered object becomes smaller or thinner without deviation from a continuous linear, circular, or elliptical pattern—meaning without protrusions containing additional surface angles, edges, or sides.

Defendant's suggested "roughness" consideration more appropriately describes the surface texture rather than geometrical shape. While the adjectives "smooth"[70] and "rough"[71] are paradigm antonyms, the use of "smoothly" as an adverb modifying "tapered" favors Plaintiff's suggested construction of an object that becomes smaller or thinner toward one end "without projections or unevenness."

### F. Smoothly Curved

Next, the parties dispute the meaning of the related term "smoothly curved" found in the '664 Patent claim 3 and 13 language requiring "the upper surface of the [tape] body [to be] smoothly curved between the lateral edge portions."[72]

Here, Plaintiffs argue that "smoothly curved" means "curved and free from protrusions or unevenness," while Defendants argue the term means "to continuously bend or deviate from a straight line without any angles or roughness."[73]

---

[69] *Smooth*, Dictionary.com, https://www.dictionary.com/browse/smooth (last visited May 19, 2021).
[70] *Id.*
[71] *Rough*, Dictionary.com, https://www.dictionary.com/browse/rough (last visited May 19, 2021).
[72] Doc. 53-2 at 5:40–41; 6:40–41.
[73] Doc. 53 at 25; Doc. 54 at 14.

-13-

Case No. 1:19-cv-748
Gwin, J.

As discussed above, the Court believes the adverb "smoothly" describes geometrical shape rather than surface texture. Accordingly, the Court again disagrees with Defendants' use of the term "roughness."

With this difference resolved, the Court believes that the parties largely agree on the meaning of "smoothly curved." Plaintiffs' definition, while partially circular, describes a shape "without any angles," while Defendants' definition describes a shape "free from protrusions or unevenness." In a geometric context, protrusions, unevenness, and angles are synonyms that describe the same phenomenon—namely, where deviations from a continuous linear, circular, or elliptical pattern cause a shape to have geometric corners or edges.

Further, the term "curve" colloquially means "a continuously bending line."[74] The thus Court finds that that the term "smoothly curved" means "to continuously bend or deviate from a straight line without any angles, protrusions, or unevenness."

### G. Unintentional Lifting

The parties next dispute the meaning of the claim 11 language indicating that "the first and second junctions [are] disposed on the uppermost surface of the floor such that the floor marking tape limits unintentional lifting of the floor marking tape from the floor."[75]

Plaintiffs propose that the cited language means the tape junctions "are positioned on top of the floor such that the floor marking tape limits unintentional lifting of the floor marking tape from the floor."[76] Defendants counter that the cited claim 11 language means

---

[74] *Curve*, Dictionary.com, https://www.dictionary.com/browse/curve (last visited May 19, 2021).
[75] Doc. 53-2 at 6:29–32.
[76] Doc. 53 at 24; Doc. 54 at 13.

-14-

Case No. 1:19-cv-748
Gwin, J.

the junctions "are located where they are supported by the uppermost surface of the floor such that the floor marking tape does not lift up from the floor unless intended to by a human."[77]

The Court finds that parties' dispute between the tape junctions being "positioned on top of the floor" or "located where they are supported by the uppermost surface of the floor" is not substantially contested or consequential. The Court adopts Defendants' "supported by the uppermost surface of the floor" construction because it better tracks the dictionary definition or the preposition "on" found in the claim 11 language.[78]

The heart of the parties' dispute over this term, however, is the meaning of "unintentional lifting." Plaintiffs propose a somewhat circular definition that the tape "limits unintentional lifting of the floor marking tape from the floor."[79] Defendants, on the other hand, suggest that the "tape does not lift up from the floor unless intended to by a human."[80]

The Court believes that Plaintiffs have the better definition. The term "unintentional lifting" is self-explanatory in the '664 Patent's context. Further, Plaintiffs' construction that the tape "limits unintentional lifting" is more appropriate than Defendants' construction that the tape "does not lift up from the floor unless intended to by a human."[81] The '664 Patent covers an invention that limits unintentional lifting rather than one that entirely prevents it.

H. *ASTM D523 Gloss Test*

---

[77] *Id.*
[78] *On*, Dictionary.com, https://www.dictionary.com/browse/on (last visited May 19, 2021).
[79] Doc. 53 at 24; Doc. 54 at 13.
[80] *Id.*
[81] *Id.*

-15-

Case No. 1:19-cv-748
Gwin, J.

Last on the '664 Patent slate, the parties dispute the meaning of the term "ASTM D523 gloss test" in the claim 4 and 14 language that requires that the tape body have "a surface finish that reads over 45 on an ASTM D523 gloss test taken at a 60 degree angle."[82]

Plaintiffs offer a straight-forward construction that an "ASTM D523 gloss test" is "a test for gloss or reflectance against a standard, measuring light reflected by a surface."[83] Defendants offer a more technical definition: a "test to determine the relative luminous reflectance factor of a specimen in the mirror direction using the equipment and procedure set forth in ASTM D523."[84]

While the parties offer little substantive argument, the Court thinks Defendants' position better. Plaintiffs' description admirably attempts to explain the ASTM D523 test in lay terms. But the relevant claim 4 and 14 language is explicitly limited to ASTM D523 gloss test results, not merely the results of any "test for gloss or reflectance against a standard, measuring light reflected by a surface."

### I. Modified PSTC-101 Test Method

The sole term the parties dispute with respect to the '220 patent is "modified PSTC-101 test method." The Court recognizes that the parties have briefed two motions to dismiss the '220 Patent related claims in this case.[85] The Court's interpretation of the disputed "modified PSTC-101 test method" term here shall have effect only if the parties' '220 Patent claims proceed.

---

[82] Doc. 53-2 at 5:43–44; 6:43–44.
[83] Doc. 53 at 27; Doc. 54 at 15.
[84] *Id.*
[85] Doc. 55; Doc. 56; Doc. 65; Doc. 66; Doc. 69; Doc. 70.

-16-

Case No. 1:19-cv-748
Gwin, J.

The disputed "modified PSTC-101 test method" term appears in the following '220 patent claim 3, 9, and 18 language:

> [3.] The roll of an adhesive tape aisle marking system as set forth in claim 1, where the test method further includes peeling the sample of the adhesive tape aisle marking system according to a modified PSTC-101 test method where the modified PSTC-101 test method comprises a dwell time of one hour.[86]
>
> [and]
>
> [9.] The roll of an adhesive tape aisle marking system as set forth in claim 1, where the adhesive tape aisle marking system comprises a peel adhesion between 4.7 and 5.7 pounds per inch width when the laminated substrate is removed and a sample of the adhesive tape aisle marking system is adhered, the tape adhesion measured under a modified PSTC-101 test method where the modified PSTC-101 test method comprises a dwell time of one hour.[87]
>
> [and]
>
> [18.] The aisle marking system set forth in claim 17, where the test further includes peeling the sample of the aisle marking system according to a modified PSTC-101 test where the modified PSTC-101 test comprises a dwell time of one hour.[88]

The PSTC-101 test has six different variants—tests A through F.[89] The '220 Patent claim language does not specify a specific PSTC-101 variant. The '220 Patent specifications, however, single out the PSTC-101D variant. Plaintiffs accordingly argue that the term "modified PSTC-101 test method" in the '220 Patent claims should be limited to the "modified PSTC-101D test method," mentioned by name in the specifications.[90]

---

[86] Doc. 54-2 at 4:59–64.
[87] *Id.* at 5:33–40.
[88] *Id.* at 6:38–42.
[89] Doc. 53-16 at 2.
[90] Doc. 53 at 29; Doc. 54 at 17.

Case No. 1:19-cv-748
Gwin, J.

Defendants, by contrast, argue that the term "modified PSTC-101 test method" allows for testing under any of the six PSTC-101 variants.[91] In support of this argument, Defendants point out that the '220 Patent specifications also describe the following testing method:

> The modification included dwell time. Peel adhesion is a measure of the strength of the adhesive bond between the tape and the test surface. Exactly one (1.0) inch wide samples were applied to a standard stainless steel test panel at a rate of 24 in/min with a 4.5 pound rubber covered roller according to the method. The tape was then peeled from the substrate at a 90° angle after a dwell time of one hour.[92]

Defendants argue that this described testing method is similar to the PSTC-101F testing variant, meaning that the '220 Patent specifications cite more than one PSTC-101 method.[93] However, Defendants neglect to mention that the sentence before the above-quoted portion indicates that "[p]eel adhesion was tested accordingly to a modified PSTC-101D method."[94]

Accordingly, the Court finds that the specification language resolves the ambiguous "modified PSTC-101 test method" term in '220 Patent claims 3, 9, and 18, in favor for the PSTC-101D test method.

IT IS SO ORDERED

Dated: May 19, 2021             *s/ James S. Gwin*
                                                             JAMES S. GWIN
                                                             UNITED STATES DISTRICT JUDGE

---

[91] *Id.*
[92] Doc. 54-2 at 3:31–37.
[93] Doc. 53 at 14; Doc. 53-16 at 2; Doc. 64 at 58:6–13.
[94] Doc. 54-2 at 3:30–31.