UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------

CLIFFORD A. LOWE, *et al.*,                    :

       Plaintiffs,                         :

vs.                                            :

SHIELDMARK, INC., *et al.*,                    :

       Defendants.                         :
------------------------------------------------------------

Case No. 1:19-cv-748

OPINION & ORDER
[Resolving Docs. 148 & 169]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

With this opinion, the Court primarily considers whether Plaintiffs Clifford Lowe and InSite Solutions, LLC ("Insite North Carolina") continue to have standing for this patent infringement lawsuit.

When Plaintiffs first brought this case, Lowe owned the relevant patent and InSite North Carolina owned an exclusive license. But in December 2021, and while Plaintiffs' appeal was pending before the U.S. Court of Appeals for the Federal Circuit, Lowe sold his patent ownership to InSite North Carolina. Then, a week later, InSite North Carolina gave InSite Delaware—not a party in this case—a paid-up, permanent, and irrevocable, but non-exclusive, license.

InSite North Carolina's license to InSite Delaware made no restrictions on InSite Delaware's ability to sublicense the patent. While acknowledging that Lowe had earlier given InSite North Carolina all patent rights, Lowe alleges that InSite North Carolina granted Plaintiff Lowe a right to continue this litigation.

Because the Court finds that Plaintiffs Lowe and InSite Solutions, LLC ("InSite North Carolina") do not have this patent's exclusionary rights, they lack standing to continue this

Case No. 1:19-cv-748
Gwin, J.

three-year-old patent infringement case, and the Court **DISMISSES** this action for lack of

subject matter jurisdiction.

For alternative dismissal grounds, the Court **GRANTS** Defendants' patent invalidity

summary judgment motion.[1]

### I.   Background

The Plaintiffs and Defendants compete in the industrial floor marking tape field.

This case began in 2019, when Plaintiffs Lowe and InSite North Carolina sued Defendants

ShieldMark, Inc., Advanced Plastics, Inc., and Crown Equipment Corporation.  Plaintiffs

alleged the infringement of Patent No. 10,214,664 ("'664 Patent").  Defendants

counterclaimed that the '664 Patent is invalid.  Defendants denied any infringement.

After issuing a *Markman* decision, this Court gave Defendants summary judgment

after the Court construed the '664 Patent as including elements that both sides

acknowledged were not present in the alleged infringing products.  Plaintiffs disagreed with

the Court's *Markman* construction of the '664 Patent and took an appeal.

On appeal, the U.S. Court of Appeals for the Federal Circuit disagreed with this

Court's *Markman* construction.[2]  The Federal Circuit found this Court's patent

interpretation incorrectly used the '664 Patent's specifications to put limits on the broader

'664 Patent's claims.  The Court of Appeals then vacated in part, remanded in part and

affirmed in part this Court's earlier rulings.[3]

---

[1] *Cf. Golden Eye Media USA, Inc. v. Evo Lifestyle Prod. Ltd.*, No. 2021-2096, 2022 WL 2232517, at *3 (Fed. Cir. June 22, 2022) (addressing additional argument "in the interest of thoroughness" and because court was "not the court of last resort").  However, in light of the Court's conclusion that Plaintiffs lack standing, the Court declines to address the Lanham Act summary judgment issue in this opinion.
[2] Doc. 110.
[3] Doc. 110.

Case No. 1:19-cv-748
Gwin, J.

Shortly after the Federal Circuit mandate issued, Plaintiffs filed a Fourth Amended Complaint[4] that re-alleged an earlier-made Lanham Act claim that Plaintiffs had voluntarily dismissed before taking the appeal.[5]

On remand, the Court ordered supplemental summary judgement briefing on Defendants' unresolved patent invalidity counterclaim.

While that briefing was in progress, Defendants found that Plaintiff Lowe had arguably sold the '664 Patent.  Defendants argued that the Court should dismiss this action because of a change in the '664 Patent's ownership.[6]

During earlier discovery, Defendants had requested discovery of all '664 Patent ownership materials.[7]  Despite its Rule 26 obligation to update discovery, Plaintiffs had not provided any amended discovery responses describing Lowe's ownership sale.[8]  The Court then ordered Plaintiffs to produce relevant ownership documents.[9]

In addition, although the documents revealed that there was a change in the '664 Patent's ownership while Plaintiffs' appeal was pending before the Federal Circuit, Plaintiffs did not tell the Federal Circuit that there was an ownership change.

Now that the parties completed supplemental invalidity and standing briefing and the Court conducted oral argument,[10] the Court resolves these issues below.

## II.    Article III Standing

---

[4] Doc. 127.
[5] Doc. 126.
[6] Doc. 150.
[7] Doc. 169 at 11.
[8] *Id.*
[9] Doc. 159.
[10] The Court conducted video oral argument on August 15, 2022.

Case No. 1:19-cv-748
Gwin, J.

Patents include various rights that can be divided and assigned, or retained in whole or part.[11]  As the inventor, Lowe initially held all the rights but he alienated some or more of them through transfers, assignments, and licenses.  However, "[w]hile parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements."[12]

In a patent infringement lawsuit, "[t]he touchstone of constitutional standing [. . .] is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury."[13] Exclusionary rights "involve the ability to exclude others from practicing an invention or to forgive activities that would normally be prohibited under the patent statutes."[14]

The right to exclude needs be measured for each defendant.[15]  A plaintiff may have standing to sue some infringers but not others.  If the accused infringer has or may obtain a license from a third party, the patent infringement plaintiff does not have exclusionary rights against that infringer, and does not have standing to sue that arguable infringer.[16]

The issue presented here is properly described as mootness: "[t]he question of whether the [c]ourt *loses* jurisdiction over a case where a plaintiff has standing at the outset."[17]  Additionally, under Supreme Court precedent, "[t]he party invoking federal jurisdiction bears the burden of establishing [standing]."[18]

---

[11] *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 n.8 (Fed. Cir. 2007).
[12] *Id.*
[13] *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010).
[14] *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (internal citations omitted).
[15] *See WiAV Sols. LLC*, 631 F.3d at 1267.
[16] *See Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010) (citing *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000)).
[17] *Pi-Net Int'l, Inc. v. Focus Bus. Bank*, 2015 WL 1538259, at *2 (N.D. Cal. Apr. 6, 2015).
[18] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

-4-

Case No. 1:19-cv-748
Gwin, J.

### A. Factual Background

#### i. Fourth Amended Complaint

On June 6, 2022, Plaintiffs Lowe and InSite North Carolina filed the Fourth Amended Complaint.[19]  In that complaint, Plaintiffs alleged:

> Lowe is the owner of all rights, title, and interest in and to the '664 Patent. [InSite North Carolina] is an exclusive licensee under the '664 Patent engaged in the manufacture, distribution and sales of floor marking tape pursuant to its license and under the name "Superior Mark."  Lowe and [InSite North Carolina] share rights of enforcement and recovery under the '664 Patent.[20]

Plaintiffs now acknowledge that the Fourth Amended Complaint does not accurately reflect the June 6, 2022, patent-in-suit ownership.[21]

The Court describes the recently disclosed patent ownership documents below.

#### ii. The Patent Rights Assignment (Lowe to InSite North Carolina)

On December 9, 2021, Lowe signed a contract with InSite North Carolina.[22]  In that contract, Lowe "[sold], assign[ed], convey[ed] and transfer[red]" to InSite North Carolina his "*entire right, title, and interest*" in the '664 Patent.[23]  Lowe also convey[ed] all of [his] rights arising under [ . . . ] any [ . . . ] United States laws [ . . . ], *including but not limited to any cause(s) of action and damages accruing prior to this assignment.*"[24]

#### iii. The Patent License Agreement (InSite North Carolina to InSite Delaware)

---

[19] *See* Doc. 126.
[20] Doc. 127 at 3.
[21] Doc. 176 at 12.
[22] Doc. 169-1.
[23] *Id.* at PageID #: 6065.
[24] *Id.* (emphasis added).

Case No. 1:19-cv-748
Gwin, J.

One week later, on December 16, 2021, InSite North Carolina entered into a license agreement with InSite Solutions, LLC of Delaware ("InSite Delaware").[25]  InSite Delaware has never entered an appearance as a party in this case.

With the December 16, 2021 agreement, InSite North Carolina gave InSite Delaware:

> [A] worldwide, *non-exclusive, fully transferable, fully sublicensable (through multiple tiers), royalty-free, fully paid-up, perpetual, irrevocable, and non-terminable license* under ['664 Patent] to practice any methods or systems described in or claimed by the ['664 Patent], and to make, have made, use, sell, and otherwise distribute, offer to sell, or import and export any technology, products or services described in or claimed, in whole or in part, by the ['664 Patent].[26]

InSite North Carolina also granted to InSite Delaware an "exclusive option" to purchase the '664 Patent for no additional cost.[27]  If InSite Delaware exercises the option, InSite North Carolina agreed to give InSite Delaware "all causes of action (whether known or unknown or whether currently pending, filed, or otherwise)."[28]

Also in the December 16, 2021 agreement between InSight North Carolina and InSight Delaware, InSite Delaware "acknowledges and agrees that Lowe [ . . . ] and [InSite North Carolina] retain the exclusive rights to elect to maintain, control, and settle [this litigation].  Lowe and [InSite North Carolina] also retain the exclusive rights to enforce the ['664 Patent] for recovery of damages for infringement prior to [December 16, 2021]."[29]

### iv.    InSite North Carolina's Alleged Exclusive License to Lowe

---

[25] Doc. 169-2.
[26] *Id.* at PageID # 6071 (Section 2.1) (emphasis added).
[27] *Id.* (Section 2.2).
[28] *Id.*
[29] *Id.* (Section 2.3).

Case No. 1:19-cv-748
Gwin, J.

According to Plaintiffs' brief, InSite North Carolina "granted Lowe the exclusive right to continue to assert infringement against alleged infringers of the '664 Patent during his [InSight North Carolina's] ownership of the '664 Patent, expressly including against ShieldMark."[30]  Plaintiffs say that the InSite North Carolina-InSite Delaware agreement gives evidence of this license.[31]  Although Plaintiffs do not cite a specific provision, they presumably refer to the above-described section regarding the right to control this action. They also say that the license agreement was not in writing.[32]  They do not affirmatively state that there was an oral agreement.

### B.  Analysis

#### i.  Plaintiff Lowe

Plaintiff Lowe no longer has standing for this lawsuit.  In the Lowe-InSite North Carolina agreement, Lowe gave up his entire interest in the '664 Patent, including all causes of action.  The Court finds Lowe's arguments that he re-gained his ability to pursue this lawsuit unpersuasive.  And, even if InSite North Carolina could transfer InSite North Carolina's right to sue Defendants, the transfer would not give Lowe standing because InSite North Carolina had given Insite Delaware an unfettered ability to destroy InSite North Carolina's ability to exclude.

First, the Court finds that Lowe has not met his burden in proving that he is an exclusive licensee of the '664 Patent.[33]  Although Lowe correctly notes that a license

---

[30] Doc. 176 at 7.
[31] *Id.*
[32] *Id.*
[33] *Cf. W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 119 (2d Cir. 1930) (exclusive license agreement as including "the promise that the grantor will give no further licenses.").

Case No. 1:19-cv-748
Gwin, J.

agreement need not be in writing,[34] Lowe has not presented adequate evidence that an exclusive license agreement exists.[35]  He does not even affirmatively allege there was an oral exclusive license agreement.  Lowe says that the InSite North Carolina-InSite Delaware agreement references Lowe's exclusive license, but it only references Lowe's purported ability to control this litigation, which is different from an exclusive license.

Additionally, the Court notes that InSite North Carolina's December 16, 2021 *non-exclusive license* grant to InSite Delaware would conflict with InSite Delaware's alleged earlier grant of an *exclusive license* to Lowe.  This supports the Court's finding that Lowe's exclusive license agreement does not exist or Plaintiffs' failed to sufficiently establish it to meet their burden here.[36]

Second and more importantly, to the extent that Lowe maintained any right to continue this litigation, the right to sue—on its own—is not enough to satisfy the constitutional standing requirement.  In *Morrow v. Microsoft Corp.*,[37] the Federal Circuit found that a plaintiff with a claimed "right to sue infringers" did not have standing when a different entity owned the patent and owned the "right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights."[38]

Lowe sits in the same position as the *Microsoft* General Unsecured Creditors' Liquidating Trust ("GUCLT").  In *Microsoft,* the GUCLT had received "claims for . . . infringement of [the predecessor's] intellectual property rights."  As in *Microsoft*, a party

---

[34] *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir. 2003).
[35] *Cf. Visioneer, Inc. v. KeyScan, Inc.*, 626 F. Supp. 2d 1018, 1025 (N.D. Cal. 2009) (finding insufficient evidence that license existed).
[36] Because Lowe explicitly conveyed "any cause(s) of action," Doc. 169-1 at PageID # 6065, this case is distinguishable from *MTS Sys. Corp. v. Hysitron, Inc.*, 2008 WL 11463565, at *2 (D. Minn. Dec. 1, 2008)).
[37] 499 F.3d 1332 (Fed. Cir. 2007).
[38] *Id.* at 1342.

-8-

Case No. 1:19-cv-748
Gwin, J.

loses standing where "the exclusionary rights have been separated from the right to sue for infringement."[39]  Since Lowe has kept no exclusionary rights in the '664 Patent, even if he did keep the right to prosecute this action, he does not have standing.

### ii.  Plaintiff InSite North Carolina

Since InSite North Carolina retained legal title to the '664 Patent, the question here is "whether the patent owner transferred away sufficient rights to divest it of any right to sue."[40]

As described in *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,[41] patent owners can give certain license rights away while keeping others.  The *Mann* Court looked to an earlier Federal Circuit case establishing that when a patent owner gives up "all substantial rights" to an exclusive licensee, "the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own."[42]  In that scenario, only the licensee has standing to sue; "the licensor may not."[43]

To determine whether the "licensor has transferred away sufficient rights to render an exclusive licensee the owner of a patent," the *Mann* court gave a list of non-exhaustive factors that courts should consider.  The Court wrote:

> Of course, transfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment.  [. . .].  We have also examined the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the

---

[39] *Id.*
[40] *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010).
[41] 604 F.3d 1354 (Fed. Cir. 2010).
[42] *Id.* at 1359–60 (discussing *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed.Cir.2006)).
[43] *Id.* at 1360.

-9-

Case No. 1:19-cv-748
Gwin, J.

> obligation of the licensor to continue paying patent maintenance fees, and
> the nature of any limits on the licensee's right to assign its interests in the
> patent. [. . . ].  Frequently, though, the nature and scope of the exclusive
> licensee's purported right to bring suit, together with the nature and scope of
> any right to sue purportedly retained by the licensor, is the most important
> consideration. [. . .].  It does not, however, preclude such a finding if the
> licensor's right to sue is rendered illusory by the licensee's ability to settle
> licensor-initiated litigation by granting royalty-free sublicenses to the accused
> infringers.[44]

Even though the *Mann* court was considering a situation in which a patent owner
gives an exclusive license, unlike the non-exclusive license InSite North Carolina gave to
InSite Delaware, the same logic applies.  Here, the Court's determination (as discussed
below) is that InSite North Carolina transferred "all substantial rights" to InSite Delaware.[45]
And although InSite Delaware is positioned as the "owner" for standing purposes, InSite
Delaware cannot sue because InSite Delaware holds only a non-exclusive license.

The Court finds that InSite Delaware would not have standing to sue after
considering the factors described in the *Mann* decision.

To start, although InSite North Carolina or Lowe may control this litigation, that
right is illusory since InSite North Carolina did not keep any authority over InSite
Delaware's right to issue sublicenses.  Multiple conditions of the InSite North Carolina-
InSite Delaware agreement show that InSite Delaware could sublicense without restriction.
Nothing in the agreement limits InSite Delaware's grant of sublicenses.  And nothing limits
InSite Delaware's ability to grant a license to Defendants.[46]  Rather, InSite's Delaware

---

[44] *Id.* at 1360–1361.
[45] *Cf. Uniloc 2017 LLC v. Google LLC*, 508 F. Supp. 3d 556, 565 (N.D. Cal. 2020) (quoting *Mann*, 604 F.3d at 1359)
("The determination of a 'patentee' is an all-or-nothing proposition: a patent has only one 'patentee' at a given time and
cannot have 'multiple separate owners.'").
[46] *Cf. Uniloc 2017 LLC*, 508 F. Supp. 3d at 568 (determining that non-party's ability to sublicense to defendants defeated
standing).

-10-

Case No. 1:19-cv-748
Gwin, J.

sublicense is "fully transferable, fully sublicensable [ . . . ], perpetual, irrevocable, and non-terminable."[47]

Furthermore, the InSite North Carolina-InSite Delaware agreement says that: "[InSite North Carolina] retain[s] the exclusive rights to enforce [the '664 Patent] for recovery of damages for infringement *prior* to [December 16, 2021]."[48]  By implication, this contract provision means that InSite North Carolina gave up its patent enforcement rights *after* December 16, 2021.

Lastly, the InSite North Carolina - InSite Delaware agreement gives InSite Delaware a paid-up license with no future financial obligations to InSite North Carolina.  The unrecallable InSite Delaware license also goes against InSite North Carolina's continued standing.  The license is "royalty-free" and "fully-paid up."[49]  The agreement also provides InSite Delaware a no-cost option to purchase title to the '664 Patent, upon which "all causes of action" would transfer to InSite Delaware.[50]

### C.  Dismissal with Prejudice

The Federal Circuit has held that "dismissal with prejudice is generally inappropriate where the standing defect can be cured."[51]  But here, the Court finds that both Plaintiffs lack standing—and pleading different facts will not change that result.  This Court's ruling flows from the Court's analysis of the underlying patent ownership documents.  And because InSite Delaware is third-party nonexclusive licensee, any amendment to include

---

[47] Doc. 169-2 at 2 (Section 2.1).
[48] Doc. 169-2 at 3 (Section 2.3) (emphasis added).
[49] Doc. 169-2 at 2 (Section 2.1).
[50] *Id.* at 2–3 (Section 2.2).
[51] *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005); *see also Great Lakes Intell. Prop. Ltd. v. Sakar Int'l, Inc.*, 516 F. Supp. 2d 880, 893 (W.D. Mich. 2007).

Case No. 1:19-cv-748
Gwin, J.

InSite Delaware would not cure the standing defect.[52]  Accordingly, the Court dismisses this case with prejudice.

## III.  Invalidity

In the alternative, the Court would grant summary judgment to Defendants on the grounds that the '664 Patent is invalid as anticipated by U.S. Patent 6,120,395 ("Dorenbusch").

### A.  '664 Patent Construction

The Federal Circuit explained and construed the '664 Patent as follows:

> [The] '664 Patent is directed to an improved floor marking tape. The specification explains that existing tape was "prone to being caught on floor cleaning devices or skids." '664 Patent, col. 1 ll. 28–30. The patented invention purports to solve that problem by disclosing tape with features that prevent it from "unintentional lifting and delamination" from the floor. *Id.* Abstract. The "[t]ape 10 generally includes a body 20 having an upper surface 22 and a lower surface 24." *Id.* col. 2 ll. 19–24. The body has a "pair of lateral edges" that are "smoothly beveled," thus "prevent[ing] tape 10 from being unintentionally lifted." *Id.* col. 1 ll. 42–43; col. 2 ll. 23–27.
>
> [ . . . ]
>
> Claims 1 and 11 are the only independent claims. Claim 1 reads as follows:
>
>> 1.  A floor marking tape adhered to a floor wherein the floor marking tape establishes a boundary on the floor; the combination comprising:
>>
>> a floor having an uppermost surface; the uppermost surface of the floor configured to support personnel and equipment thereupon;
>>
>> a floor marking tape having a body that has an upper surface and a lower surface; the lower surface facing the uppermost surface of the floor to which the floor marking tape is adhered

---

[52] *Cf. id.* at 976 (citing *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1552 (Fed. Cir. 1995)) ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement.").

Case No. 1:19-cv-748
Gwin, J.

> such that the body of the floor marking tape is disposed above the uppermost surface of the floor;
>
> the body of the floor marking tape having a longitudinal direction;
>
> the body of the floor marking tape having first and second *lateral edge portions* disposed in the longitudinal direction; each of the first and second *lateral edge portions* having an upper surface and a lower surface;
>
> each of the first and second *lateral edge portions* having a width defined in a direction perpendicular to the longitudinal direction;
>
> the upper surface of each *lateral edge portion* comprising an extension of the upper surface of the body;
>
> the lower surface of each *lateral edge portion being a flat coplanar extension* of the lower surface of the body;
>
> the entire body of each *lateral edge portion* being tapered with the upper surface of the first *lateral edge portion* extending to the lower surface of the first *lateral edge portion* and the upper surface of the second *lateral edge portion* extending to the lower surface of the second *lateral edge portion*;
>
> each of the first and second *lateral edge portions* having a maximum height that is less than its width; and
>
> an adhesive securing the lower surface of the body to the uppermost surface of the floor to establish a boundary.

*Id.* col. 5 ll. 2–36 (emphases added).

Claim 11 similarly recites a "a floor marking tape adhered to a floor" with a "body" and tapered "*lateral edge portions.*" *Id.* col. 6 ll. 1–36 (emphasis added).

Claims 10 and 20 depend from claims 1 and 11, respectively. They each recite that the tape has "a *central body portion* disposed between the first and second lateral edge portions." *Id.* col. 5 ll. 61–67 (emphasis added); col. 6 ll. 61– 67 (emphasis added).

-13-

Case No. 1:19-cv-748
Gwin, J.

All of the remaining asserted claims depend from one of the above noted independent claims.[53]

The Federal Circuit "adopt[ed] Lowe's construction" of three disputed claim terms.[54]

Accordingly, this Court construes these claim terms consistent with the Federal Circuit construction:

- *Lateral edge portion* to mean "a portion of the tapered edges of the tape body[;]"[55]

- *Lower surface of each lateral edge portion being a flat coplanar extension of the lower surface of the body* to mean "the bottom surfaces of the lateral edge portions are flat, lie in the same plane, and define an extension of the lower surface of the body[;]"[56] and

- *Central body portion* to mean the "portion of the tape that extends along and on each side of the body's centerline."[57]

### B. Legal Standard

A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[58]  There is a genuine dispute as to a material fact when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[59]

Patents are presumed valid.[60]  This presumption can only be overcome by clear and convincing evidence.[61]  "Thus, a moving party seeking to invalidate a patent at summary

---

[53] Doc. 110 at 3–5.
[54] *Id.* at 16.
[55] *Id.* at 11.
[56] *Id.* at 14.
[57] *Id.* at 16.
[58] Fed. R. Civ. P. 56(a).
[59] *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[60] *See* 35 U.S.C. § 282(a).
[61] *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

-14-

Case No. 1:19-cv-748
Gwin, J.

judgment must submit such clear and convincing evidence of invalidity so that no

reasonable jury could find otherwise."[62]

### C. Anticipation

Under Federal Circuit precedent, "[a] patent is invalid for anticipation if a single

prior art reference discloses each and every limitation of the claimed invention."[63]  "[A]

prior art reference may anticipate without disclosing a feature of the claimed invention if

that missing characteristic is necessarily present, or inherent, in the single anticipating

reference."[64]  For prior art to anticipate a claim, "it must be sufficient to enable one with

ordinary skill in the art to practice the invention."[65]  And, Federal Circuit decisions

acknowledge that a prior art reference need not use the same language as a patent claim.[66]

### D. Dorenbusch

Dorenbusch concerns a temporary spot marker used on a floor surface like a

basketball court.[67]

Dorenbusch purports to solve the problem of players tripping on the tape,[68] and

accordingly, specifies that the makers have specific edges:

> To further aid in making the sport marker non-interfering, all peripheral
> edges are beveled downwardly to present a gently rising edge area.
> Preferably, the peripheral edges are angled downwardly towards the floor to
> create an about 30 degree to about 60 degree angles to the horizontal.[69]

---

[62] *Id.*
[63] *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *see also Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc.*, 609 F.3d 1345, 1349 (Fed. Cir. 2010) ("While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact.").
[64] *Id.*
[65] *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).
[66] *See, e.g., In re* Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009).
[67] Doc. 77-2. col 1:11–28.
[68] *Id.* col 2: 54–56.
[69] *Id.* col. 2:60–65.

-15-

Case No. 1:19-cv-748
Gwin, J.

The Dorenbusch marker is depicted in the below Figure 4, which is "a side

elevational view" of the Dorenbusch marker.[70]



FIG. 4

Additionally, Dorenbusch discusses using an adhesive on the underside of the

marking tape but does not require an adhesive bottom surface.  Dorenbusch teaches that:

"[A] thin layer of adhesive can be applied to the underside of each spot marker."[71]

And, the Dorenbusch claim 1 reads:

> [E]ach said individual spot marker further having (i) a substantially flat low
> profile with a thickness of from about 100 mils to about 300 mils, (ii)
> peripheral edges beveled downwardly at an about 30 degree to about 60
> degree angle to the horizontal, (iii) a non-slip bottom surface for resisting
> lateral forces, and (iv) a textured top surface, whereby each said individual
> spot marker when placed on the surface resists lateral forces to remain in
> place yet is readily lifted from the surface for movement to another area or
> storage.[72]

### E.  Analysis

Defendants argue that Dorenbusch anticipates the at-issue '664 Patent claims.  In a

chart, Defendants allege that every element of the asserted claims is found in

Dorenbusch.[73]

---

[70] *Id.* col. 2:3–4.  Figure 6 similarly depicts the side-view of a differently shaped marker.  *See id.* at col. 2:7–8.
[71] *Id.* col. 3:15–16.
[72] *Id.* col. 4:7–16.  Claims 7 and 11 both include the same claim elements.
[73] Doc. 135-1.

Case No. 1:19-cv-748
Gwin, J.

Both in the initial[74] and post-remand summary judgment briefing,[75] the only '664

Patent claim element Plaintiffs contend that Dorenbusch does not teach is: "the upper

surface of each *lateral edge portion* [comprises] an extension of the upper surface of the

body."[76]  Plaintiffs say this is evident from Dorenbusch Figure 4 (reproduced above), which

shows that "the edges 13 are sharply cut and are separate and distinct from the top surface

of the marker, rather than being an extension of the top surface as required by the claims of

the '664 Patent."[77]  Plaintiff Lowe provides a declaration that offers the same observations

based on Figure 4.[78]  Plaintiffs argue that this is an important functional difference because

the '664 Patent's "smooth transition at the edge" keeps a tape in place when heavy

industrial equipment is dragged over it.[79]

The Court finds Plaintiffs' argument unpersuasive.  Even accepting Plaintiffs'

construction of the claim that "the upper surface of each *lateral edge portion* [comprises] an

extension of the upper surface of the body," to mean that "the upper surface of each lateral

edge portion is an extension of the upper surface of the body which is tapered such as to

extend to the lower surface of the first lateral edge portion,"[80] the Dorenbusch patent

teaches the edge portion by clear and convincing evidence.

Put simply, nothing in Dorenbusch suggests that there are "four separate and distinct

surfaces."  To the contrary, Dorenbusch teaches that "all peripheral edges are beveled

downwardly to present *a gently rising edge area*."[81]  In this context, the phrase "beveled

---

[74] Doc. 80 at PageID # 4121–4122.
[75] Doc. 155 at PageID # 5906–07.
[76] This element is in both independent claims 1 and 11.
[77] Doc. 80 at PageID # 4121; Doc. 155 at PageID # 5906.
[78] Doc. 80-10 at PageID # 4163 ¶ 7.
[79] Doc. 155 at PageID # 5906.
[80] *Id.*
[81] Doc. 77-2. col. 2:61–62 (emphasis added).

Case No. 1:19-cv-748
Gwin, J.

downwardly" is synonymous with the Federal Circuit's construction of *lateral edge portion*, meaning "the tapered edges of the tape body"—or even more simply, an edge that gets thinner as it approaches the floor.

Further, Plaintiffs' interpretation of Dorenbusch would require that the lateral edges be angled at roughly 90 degrees since Plaintiffs say Dorenbusch's edges are "sharply cut" and comprise a "distinct surface[]."  However, this argument disregards Dorenbusch's specification and claim language.   Dorenbusch says, "the peripheral edges are angled downwardly towards the floor to create an about 30 degree to about 60 degree angle to the horizontal."[82]  Dorenbusch also adds that "all peripheral edges are beveled downwardly to present a *gently rising edge area*."[83]  Plaintiffs provided no argument related to these Dorenbusch aspects.

It is true that Dorenbusch Figure 4 (reproduced above) does not depict the sloped '664 edge that is depicted below in '664 Patent Figures 1, 2 and 3.[84]



But Dorenbusch Figure 4 does not depict a sharp slope as Plaintiffs allege; rather, the drawing does not zoom in on the edge portion.

---

[82] *Id.* col. 2:63–65.
[83] *Id.* col. 2:62 (emphasis added).
[84] Doc. 44-1. figs. 1–3.

Case No. 1:19-cv-748
Gwin, J.

Finally, Plaintiffs say that Dorenbusch is not prior art because of the different intended uses of the Dorenbusch markers and the '664 Patent floor tape.  In particular, Plaintiffs point out that the Dorenbusch system is meant to be easily lifted after being used,[85] while the '664 specification describes a tape that is less easily rearrangeable.[86]  But this argument distracts from the proper anticipation inquiry, which turns on whether Dorenbusch discloses the claim elements and whether a person skilled in the art would infer the '664 Patent from Dorenbusch.  And on that matter, the Court finds that Dorenbusch and the '664 Patent have similar intended uses: A marking that does not slip when in use but is nonetheless not permanent.   The '664 Patent teaches a tape that is meant to avoid "unintentional lifting;"[87] this suggests that the '664 Patent tape may be lifted intentionally.

## IV.    Other Summary Judgment Issues and Sanctions

Having determined that Plaintiffs lack standing and that the '664 Patent is invalid based on Dorenbusch, the Court declines to address the remaining issues on summary judgment in this opinion.  The Court also declines to impose sanctions on Plaintiffs at this time, but Defendants may later renew their motions.

## V.    Conclusion

The Court **DISMISSES** this action for lack of subject matter jurisdiction with prejudice. In the alternative, the Court **GRANTS** Defendants' patent invalidity summary judgment motion.

---

[85] Doc. 77-2. col. 1:29–34.
[86] Doc. 155 at PageID #: 5907 (citing Doc. 44-1. *Abstract*).
[87] Doc. 44-1. *Abstract*.

Case No. 1:19-cv-748
Gwin, J.

IT IS SO ORDERED

Dated:  August 23, 2022                         s/      *James S. Gwin*
                                                JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE