1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3    Clifford A. Lowe,              Case No. 1:19-cv-0748-JG
                                    Cleveland, Ohio
4              Plaintiff,           Monday, August 15, 2022
                                    8:30 a.m.
5         vs.

6    Shield Mark, Inc.,
     et al.,
7
               Defendants.
8
          TRANSCRIPT OF ORAL ARGUMENTS ON MOTIONS PROCEEDINGS
9                  HELD VIA VIDEO CONFERENCE
              BEFORE THE HONORABLE JAMES S. GWIN,
10            SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:       Ray L. Weber, Esq.
                              Laura J. Gentilecore, Esq.
13                            Renner, Kenner, Greive, Bobak,
                                Taylor & Weber
14                            Huntington Tower, Suite 400
                              106 South Main Street
15                            Akron, Ohio    44308
                              330-376-1242
16

17   For the Defendants:       (Continued to Page 2.)

18

19

20

21   Official Court Reporter:  Heidi Blueskye Geizer
                               Certified Realtime Reporter
22                             United States District Court
                               801 West Superior Avenue
23                             7-178 U.S. Court House
                               Cleveland, Ohio    44113
24                             216-357-7092

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

1      APPEARANCES:  (Continued.)

2      For the Defendants:        David J. Sheikh, Esq.
                                  Lee Sheikh & Haan
3                                 Ste. 2230
                                  111 West Jackson Boulevard
4                                 Chicago, Illinois   60604
                                  312-982-0070
5
                                  Howard L. Wernow, Esq.
6                                 Sand, Sebolt & Wernow
                                  1100 Aegis Tower
7                                 4940 Munson Street, NW
                                  Canton, Ohio   44718
8                                 330-244-1174

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        MORNING SESSION, MONDAY, AUGUST 15, 2022  8:30 A.M.

 2                  THE COURT:  We're here on 19-cv-748, Lowe

 3        versus ShieldMark.  We're here today for a hearing on a

 4        couple of motions filed by the defendant.

 5             The defendant has filed a motion saying that plaintiff

 6        lacks standing.  Separate, the defendant had earlier filed a

 7        motion arguing that the '664 patent involved with this case

 8        was invalid as having failed to make a sufficient disclosure

 9        and arguing that the '664 had been anticipated or in use in

10        prior materials.

11             The plaintiff has filed these -- or the defendant has

12        filed these motions, so we'll allow the -- and my thinking

13        would be to separate the two arguments.  First deal with the

14        standing argument since standing is an issue probably a

15        cornerstone for this litigation, and then separately to deal

16        with the invalidity issue.

17             So on behalf of the plaintiff, who wants to begin by

18        making argument to with regard to the standing issue?  And I

19        advise the parties, I've been through I believe all of the

20        materials.  I don't need kind of a summary of that.

21             But for the defendant, who has been designated to make

22        the standing argument?

23                  MR. SHEIKH:  Yes, Your Honor.  This is Dave

24        Sheikh, and I will be handling the argument today.

25                  THE COURT:  Okay.  So if it's transferred from
```

1    Lowe to North Carolina and then within weeks of that a non-

2    -- a license to nonexclusive license given to I will refer

3    to it as Delaware.  So is it your argument that Lowe's has

4    no standing to remain in the case?

08:48:30  5           MR. SHEIKH:  Yes, Your Honor.  Our position is

6    that none of the plaintiffs in the case thereto now --

7           THE COURT:  Let's start off with Lowe.  Lowe

8    has transferred all his property interest in the patent,

9    right?

08:48:43  10          MR. SHEIKH:  Correct, Your Honor, and that's a

11   good place to start, because that is crystal clear.

12   Mr. Lowe through an assignment transferred in December 2021

13   absolutely everything, all right, title, and interest into

14   this patent to InSite North Carolina.

08:49:06  15      I will refer, there are two InSite entities, there's

16   North Carolina and Delaware.  For shorthand I'll refer to it

17   as North Carolina.

18       He transferred everything to North Carolina.  So as

19   far as Mr. Lowe --

08:49:18  20          THE COURT:  Including -- did he also transfer

21   this lawsuit as part of that?

22          MR. SHEIKH:  Yes.  Yes, Your Honor.  The

23   assignment to North Carolina was an assignment of the right

24   to pursue and recover -- pursue infringement for past

08:49:37  25   damages and to recover damages for past infringement.  The

1    only thing -- so with respect to the patent, he has nothing.

2    All that Mr. Lowe has and all this -- they're conceding,

3    this is a hunting license, meaning that he has the right to

4    deal with this lawsuit.

08:50:04  5    THE COURT:  What's your position as to

6    whether -- does he have any personally-owned exclusionary

7    rights after the transfer?

8    MR. SHEIKH:  Absolutely not.  He has nothing,

9    Your Honor.  Mr. Lowe has nothing.  He transferred the

08:50:21 10    entire right, title, and interest, including any

11    exclusionary rights, to North Carolina.  That is absolutely

12    clear, and I think the plaintiffs are conceding that.

13    THE COURT:  Okay.  So in your take of the

14    controlling law, either the *Microsoft* case or the *Mann* case,

08:50:49 15    is the exclusionary right a prerequisite to standing?

16    MR. SHEIKH:  Yes, that's correct, Your Honor.

17    Those cases, as well as Supreme Court cases that precede it

18    by many years, made clear that the exclusionary right,

19    because a patent is by definition the right --

08:51:09 20    THE COURT:  Who was the author of the -- who

21    was the brilliant Ohio citizen who was the author of the

22    lead Supreme Court case?

23    MR. SHEIKH:  Well --

24    THE COURT:  I'll give you a hint.  He was also

08:51:24 25    a president.

1          MR. SHEIKH:  Yes.  That would be Taft, Chief

2     Justice Taft, I believe, Your Honor -- who I know is from

3     Ohio and was not only Chief Justice, but President of the

4     United States -- authored that opinion.  And that --

08:51:43  5          THE COURT:  So you're saying that if you don't

6     have exclusionary rights you lack standing.

7          What's your version of if you at one time had

8     exclusionary rights and give them up, do you have a right to

9     either proceed with litigation or regard the former right as

08:52:10  10    the chosen action that you're allowed to carry on?

11          MR. SHEIKH:  So the answer to that is with

12     standing in a patent infringement suit, it has to exist at

13     all times during the case.  So you can do things, and this

14     is what a lot of these cases deal with it.  In fact we

08:52:27  15    provided you with the *Unilock* case, which is analogous, and

16     the *Cytologics* case, which we cited as supplemental

17     authority.  It's got to exist at all times during the case.

18          So you can do things to destroy standing, and through

19     this transaction which was really never disclosed to us, we

08:52:45  20    found out late, that is what's happened.  They've lost that.

21     You cannot -- as a matter of law you cannot maintain a

22     lawsuit where you have merely a hunting license.

23          I use that term --

24          THE COURT:  Let's shift gears on the standing

08:53:04  25    issue.

1          Does North Carolina have standing?  They were a

2    plaintiff in the case.  Do they continue to have standing

3    after the Lowe-North Carolina transaction and, perhaps more

4    importantly, after the North Carolina-Delaware transaction?

08:53:26  5          MR. SHEIKH:  So the answer to that, Your

6    Honor, is no, and those two transactions took place close in

7    time.  So you have the assignment --

8          THE COURT:  Did North Carolina keep any rights

9    to -- well, did North Carolina, wasn't it an exclusive

08:53:46 10    license given to Delaware?

11          MR. SHEIKH:  No, a nonexclusive license was

12    given to Delaware --

13          THE COURT:  Did the license give Delaware the

14    right to sublicense?

08:53:59 15          MR. SHEIKH:  Correct.  And that's very

16    important --

17          THE COURT:  Was there any restrictions on who

18    Delaware could sublicense to?

19          MR. SHEIKH:  No, Your Honor.

08:54:09 20          THE COURT:  Was there any right for North

21    Carolina to recover the patent if there was some breach by

22    Delaware of the agreement?

23          MR. SHEIKH:  Not that -- not in the four

24    corners of the agreement, which I want to point out one

08:54:27 25    thing.

1          We all ought to keep in mind there is an integration

2     clause in the agreement, so really the answers to all of

3     these questions must be found in the agreement, not in any

4     separate discussions.

08:54:38  5          And the answer to your question, Your Honor, is I am

6     not aware of anything in this agreement that would allow

7     that.  What happened in this transaction was the sale of a

8     business.  The business --

9                    THE COURT:  Did Delaware -- did North

08:54:53  10    Carolina-to-Delaware have any termination date?

11                   MR. SHEIKH:  Delaware -- I'm sorry --

12                   THE COURT:  North Carolina to Delaware

13    license, did it have any termination date?

14                   MR. SHEIKH:  No --

08:55:08  15                   THE COURT:  Other than the option to purchase

16    the rest of North Carolina's interest.

17                   MR. SHEIKH:  No, Your Honor.  The license,

18    which is granted in 2.1, grants a nonexclusive license fully

19    sublicensable royalty free, perpetual, irrevocable,

08:55:32  20    nonterminable.  That's what it says.  So with the rights

21    to --

22                   THE COURT:  Were there -- was the North

23    Carolina-to-Delaware license paid up or was there any right

24    for North Carolina to receive future royalties?

08:55:52  25                   MR. SHEIKH:  No, Your Honor.  Well, it's fully

1    paid up.  The 2.1 says it's royalty free, fully paid up.

2        So at my reading of this agreement, I think it's

3    really the only reading, reasonable reading, was that the

4    consideration was the sale of the business; that all the

08:56:11  5    assets -- what was done here was Mr. Lowe was getting out of

6    the business, and so as part of that he gave everything

7    over, including a fully-paid-up perpetual license with the

8    right to sublicense to the entity that was going to stay in

9    the business, that was going to be in the business, which is

08:56:31  10    Delaware.

11        He's no longer in the business, so he kept nothing.

12    North Carolina is no longer in the business, they kept

13    nothing except a hunting license.  The hunting license is to

14    hunt -- to recover damages only up until December 15, 2021.

08:56:47  15    That's important, too; nothing past December 15, 2021.

16        They had a chosen action.  They can purport to pursue

17    this case only to sue ShieldMark to recover damages up to

18    that point.  There's no right to exclude, no right to

19    license, no right to practice the patent themselves.

08:57:09  20        Delaware can grant sublicenses without any consent,

21    you know, no right to seek any injunction.  They have said

22    repeatedly in this case, and their expert report that they

23    submitted confirms this, they are not seeking anything in

24    the case, nor do they have the right to, except a cause of

08:57:28  25    action for damages up to December 15, 2021.  After that

1   point, who knows.  And of course, we're eight months into

2   that, and nobody has the right to exclude ShieldMark from

3   doing anything at all.

4         THE COURT:  So does Delaware have any right to

08:57:51  5   exclude ShieldMark?

6         MR. SHEIKH:  No.

7         THE COURT:  It's a nonexclusive licensing.

8         MR. SHEIKH:  Correct.  Right now, the

9   situation is they have a nonexclusive license with the right

08:58:02 10   to sublicense.  They could sublicense ShieldMark; any

11   defendants in the case, they can sublicense anyone.  They

12   have an option that may or may not be exercised under which

13   they can acquire the patent, okay, from North Carolina.

14   They can --

08:58:24 15         THE COURT:  And do they have to pay anything

16   to exercise that option?

17         MR. SHEIKH:  Not by the terms of this

18   agreement, Your Honor.  I believe the agreement, again, the

19   only reasonable reading of this agreement, would be that

08:58:37 20   that consideration has already been paid and that option is

21   part of the original consideration, and if they exercise

22   that option there's no further consideration.

23         THE COURT:  Okay.  Let me shift to just kind

24   of a different path to this.

08:58:56 25       You additionally make a motion or seek sanctions in

1    this case.  Were you advised at any time of the sublicense

2    to Delaware before coming upon the North Carolina

3    registration with the Patent and Trademark Office?

4                    MR. SHEIKH:  The answer to that question is

08:59:17  5    absolutely not, and even let me clarify.  We became aware on

6    our own of a recorded assignment from Mr. Lowe to North

7    Carolina.  That recorded assignment, it was recorded on or

8    around in December 2021, we became aware of it much later.

9        That recorded assignment says nothing in it about

08:59:47 10    Delaware.  So the existence of that entity and their role

11    and any rights that might have been given by North

12    Carolina-Delaware, that has nothing to do with it.

13        So that was only the tip of the iceberg.  So we became

14    aware of that and that, as Your Honor started here,

09:00:07 15    unequivocally showed that Mr. Lowe has no standing to be in

16    the suit because he assigned --

17                    THE COURT:  Let me go on to the sanctions

18    issue.  The Lowe to North Carolina, was it dated December

19    9th?

09:00:27 20                    MR. SHEIKH:  Correct, Your Honor.  That is the

21    assignment from Lowe to North Carolina, December 9, 2021.

22                    THE COURT:  Was there any filings to the U.S.

23    District Court that somebody else may have an interest in

24    this litigation?

09:00:43 25                    MR. SHEIKH:  No.  Well, not until we --

1          THE COURT:  That Delaware might have an

2     interest in this litigation?  Did the plaintiffs file a

3     notice that another party might have an interest in this

4     litigation?

09:00:58  5          MR. SHEIKH:  Absolutely not, and that is

6     troubling, was troubling to us, and kind of goes to the

7     heart of the problem.

8        The answer is no, that did not happen, and that still

9     has not happened, frankly.

09:01:11 10          THE COURT:  Did plaintiff or appellant in this

11    Federal Circuit case, were you required to make a filing

12    that parties had an interest in the litigation?

13          MR. SHEIKH:  Yes.

14          THE COURT:  Does that have an obligation to be

09:01:32 15    supplemental if the situation changes?

16          MR. SHEIKH:  I believe so, yes, Your Honor.

17          THE COURT:  Did plaintiffs notify the circuit

18    court sometime near December 9 or December 13 that another

19    party may have an interest in the Federal Circuit

09:01:50 20    litigation?

21          MR. SHEIKH:  No, Your Honor, that was never

22    done, to my knowledge.  There's no filing or --

23          THE COURT:  At argument did they ever orally

24    advise the circuit court that they'd given a license to

09:02:09 25    somebody together with an option to purchase North Carolina?

1           MR. SHEIKH:  No, Your Honor.

2           THE COURT:  And so what damages do you contend

3      you suffered as a result of the failure to supplement

4      discovery in this case?

09:02:25  5           MR. SHEIKH:  So following -- well, first of

6      all, I think if the issue, this issue would have come up in

7      a timely fashion, it could have been raised at the Federal

8      Circuit and could have provided a basis for dismissal of the

9      lawsuit at that point, Your Honor, so that's number one.

09:02:41 10      So everything that's been done from that point forward

11      I think is unnecessary unfair prejudice and expenses to us,

12      because as we said in these filings, there was -- as of the

13      date of that transaction there's been no standing, no

14      subject matter jurisdiction.  The case should have been

09:03:01 15      dismissed.

16      Now we come to remand.  Your Honor sensibly convened

17      the parties and set forth a process by which we could deal

18      with the substantive issues in the case, including

19      invalidity of the patent, that included supplemental

09:03:15 20      briefing and additional discovery.

21      We have had to incur all of that expense,

22      inconvenience, and prejudice in disclosing, Your Honor, our

23      confidential sales information past December 15, 2021, which

24      was exposed publicly.  That's the subject of another motion.

09:03:36 25      But we have had to do all of that.  We have had to

1    deal with the substantive issues of invalidity, whereas as

2    of December 15, 2021 this case should have been dismissed.

3    No subject matter jurisdiction, case over.  Mr. Lowe sold

4    his business, there's a transaction depriving him of

09:03:55  5    standing.

6         So everything that's happened since that date has been

7    unfair prejudice to the defendants.  Everything.  This case

8    should have been over.

9              THE COURT:  Let's afford the plaintiff an

09:04:07 10    opportunity to respond on the standing and sanctions issue.

11         Let's go to the standing issue first.  Are you still

12    contending that Lowe has got some standing?

13              MR. WEBER:  Yes, Your Honor.

14              THE COURT:  How do you get around *Microsoft*

09:04:24 15    case?

16         So *Microsoft* case, they went into bankruptcy, right?

17              MR. WEBER:  Right.

18              THE COURT:  And in the bankruptcy plan they

19    divided up the debtors' interest in three piles:  A

09:04:45 20    bondholders pile, a nonsecured creditors pile, and basically

21    af administrator pile; right?

22              MR. WEBER:  Yes.

23              THE COURT:  And the administrator kept the

24    patent, right?

09:04:59 25              MR. WEBER:  I believe so, yes.

1          THE COURT:  And then the same thing, the

2     unsecured creditors received the right to sue for any past

3     infringement, correct?

4          MR. WEBER:  I believe that's correct.

09:05:15  5          THE COURT:  And didn't the Federal Circuit say

6     that that was insufficient to give them standing because the

7     administrator had the right to -- they didn't have

8     exclusivity in the case?

9          MR. WEBER:  Yes, but that's not the situation

09:05:37  10    here.

11          THE COURT:  How is this different?

12          MR. WEBER:  Well, this is different because,

13    first of all, the parties have never changed in this case.

14    There is no administrator, there are no debtors, there is

09:05:52  15    none of that.

16      You had from the -- at the time of the transfer of the

17    patent from Lowe to North Carolina there was a

18    contemporaneous assignment back from North Carolina to Lowe.

19    All they did was changed positions.  They were both

09:06:19  20    plaintiffs, they both remained plaintiffs.

21      The title of the patent was still whole, it was still

22    held by the plaintiffs, and Lowe retained the right to

23    enforce the patent along with the patent owner.

24          THE COURT:  Let me take you to *the Microsoft*

09:06:39  25    case, because the grant in that case I thought had been

1    given to the unsecured creditors to pursue any past patent

2    infringement.

3         So how is this current circumstance different than

4    when North Carolina has the legal title to the patent and

09:07:08   5    gives to Lowe a right to continue the patent litigation even

6    though Lowe does not have any exclusionary rights?

7                   MR. WEBER:  Well, Lowe did have exclusionary

8    rights --

9                   THE COURT:  Well, how did he have exclusionary

09:07:26   10    rights after the North Carolina transaction?

11                   MR. WEBER:  After the North Carolina

12    transaction there was a license back to Lowe.  The license

13    was --

14                   THE COURT:  Are you saying you can license or

09:07:42   15    you can transfer a chosen action for patent infringement?

16    Is that the argument?

17                   MR. WEBER:  The lawsuit itself would have been

18    an asset of the company.  That lawsuit was carved out of the

19    transaction.  The patent was carved out of the transaction.

09:08:07   20    Those two were negotiated, and it's acknowledged, it's

21    acknowledged by Delaware, that that's carved out.  So

22    Delaware could not have ever transferred to anyone else or

23    themselves the taking on of this litigation.

24         The litigation was an asset, the litigation as a

09:08:30   25    matter of fact reduced the price that was paid or the price

1      that was received for the company --

2                      THE COURT:  Do you have in front of you Lowe's

3      assignment to North Carolina?  Take a look at the actual

4      document you've just characterized.

09:08:57 5              MR. WEBER:  I do not have it in front of me,

6      but I'll --

7                      THE COURT:  It is document 169-1.  Let me help

8      try to read -- this is Lowe's assignment to North Carolina,

9      full paragraph -- not the last, but the second-to-last

09:09:22 10     paragraph on the first page reads, "Assignor," which means

11     Lowe, "hereby acknowledges that this assignment, being of

12     assignor's entire right, title, and interest in and to the

13     invention and patent rights carries with it the right in

14     assigning to apply to" -- "for all competent authorities and

09:09:49 15     the right to procure" -- (pause.)

16          And perhaps I'm pointing to the wrong thing.

17          New paragraph.  "Assignor does hereby sell, assign,

18     convey, transfer unto assignee and its successors assigned

19     as legal representative the entire right, title, and

09:10:31 20     interest in and throughout the world to the inventions, and

21     including together with assignor's entire right, title, and

22     interest in and to the patent rights."

23          So isn't that about as blanket an assignment as

24     possible?

09:10:55 25              MR. WEBER:  Sure, that's a forum assignment,

1  and at the same time contemporaneously North Carolina

2  granted a license back to Lowe.

3           THE COURT:  How can -- if they granted a

4  license back to Lowe, wouldn't Lowe have had to have a

09:11:27  5  substantial interest in the patent to be able to carry it

6  out?  And at the time he was transferred had he given up the

7  right to sublicense?

8           MR. WEBER:  Did Lowe give up the right to

9  sublicense?

09:11:47 10          THE COURT:  Yeah.  Did Lowe give up the right

11  to sublicense?

12           MR. WEBER:  To sublicense his license --

13           THE COURT:  No, to sublicense the patent.

14           MR. WEBER:  I mean -- oh, okay, sublicense the

09:12:03 15  patent.

16     No, I don't believe that he would have had the right

17  to sublicense the patent.  The whole --

18          THE COURT:  Did he have any right to recover

19  the patent?

09:12:15 20         MR. WEBER:  The right to recover the patent;

21  no, I don't believe so.  He was a licensee.

22          THE COURT:  Did he have any -- did he have any

23  right to control North Carolina's activities with the

24  patent?

09:12:29 25         MR. WEBER:  To the extent that he's an owner

1   of North Carolina, I would assume that he did.  I don't know

2   that it's necessarily pursuant to any agreement, but he's a

3   principal of North Carolina.

4          The whole thrust here, Your Honor, is that Mr. Lowe,

09:12:59 5   it was not a sale of his business, it was an asset sale to

6   facilitate the sale of the assets.  The -- Lowe, who always

7   owned all of the patents, seven patents or whatever, he was

8   the inventor, he owned them, he transferred them to InSite

9   North Carolina.

09:13:22 10          InSite North Carolina then assigned all but the '664

11   patent to InSite Delaware.  InSite North Carolina at the

12   same time licensed back Lowe.

13          All the two plaintiffs did was change position.  You

14   still had the owner of the patent and you still had a

09:13:49 15   licensee of the patent and you still had a lawsuit, and all

16   three of those were treated in the transaction in the right

17   to continue the lawsuit.  Nothing changed.  I mean the

18   parties were the same --

19              THE COURT:  Let me go to that, because you've

09:14:09 20   got the Lowe to the separate corporate North Carolina

21   entity, right?

22              MR. WEBER:  To the -- right, yeah, to his LLC.

23              THE COURT:  And then the other agreements

24   between the North Carolina entity and the Delaware entity,

09:14:24 25   right?

1          MR. WEBER:  Yes, which I'll acknowledge --

2          THE COURT:  Is he a party to the North

3  Carolina to Delaware entity agreement?

4          MR. WEBER:  I'm sorry, Your Honor --

09:14:39  5          THE COURT:  Was he named as one of the people

6  obtaining an interest in the patent in the North

7  Carolina-to-Delaware agreement?

8          MR. WEBER:  Yes, he was going to continue the

9  litigation.  That's an exclusionary right.

09:14:57  10          MR. SHEIKH:  Your Honor --

11          THE COURT:  How could North Carolina have

12  given him exclusionary right if they don't make the direct

13  grant to him?

14          MR. WEBER:  Licenses do not have to be in

09:15:15  15  writing.  There's all kinds of case law on that.

16      The whole intent recognized by everyone except the

17  defendants herein was he had an opportunity to sell his

18  assets.  He sold his assets.

19      He took less for his assets than what he normally

09:15:37  20  would have gotten, and for that he reserved the right to

21  continue the litigation.  That was just an interchange in

22  the positions of the patent owner and the licensee.  Before

23  InSite North Carolina had been the licensee and Lowe owned

24  the patent; then those two positions changed.

09:16:04  25      That's all that changed; standing didn't change.

1          THE COURT:  Well, do licensees always have a

2     right to bring infringement actions under your version?

3          MR. WEBER:  Do licensees always have a right?

4     No.

09:16:22  5          THE COURT:  And what's the requirement before

6     they have standing to bring an infringement action?

7          MR. WEBER:  They have to typically bring in

8     the patentee.

9          THE COURT:  Well, they typically do, but it's

09:16:37 10     not -- actually you're wrong about that.  It's not the

11     patentee, it's bringing in the current owner.

12          MR. WEBER:  Well, the patentee is defined by

13     statute and those terms are interchanged, but technically

14     I'll accept what you're saying, Your Honor, the patent

09:16:57 15     owner.  So you join the patent owner.

16          THE COURT:  But in either the patent owner or

17     the patentee, don't they also need to retain a substantial

18     interest in the patent that basically gives them the right

19     to exclude third or fourth or fifth parties from exercising

09:17:22 20     the patented product?

21          MR. WEBER:  Well, that's inherent with a

22     patent.

23          Maybe I didn't understand your question.  That's

24     inherent to the patent owner has that right.

09:17:35 25          THE COURT:  Okay.  Well, it's also a

1    prerequisite, right?

2                    MR. WEBER:  Yes, I would think.

3                    THE COURT:  Isn't that what Justice Taft,

4    Chief Justice Taft held in the, I believe in the 1920 case?

09:17:51  5                    MR. WEBER:  I believe so, and I'll accept your

6    word on that.

7                    THE COURT:  How different would that case be

8    from this case?

9                    MR. WEBER:  It was a nonexclusive license to

09:18:06  10   Delaware, for one thing, nonexclusive license to Delaware.

11   The suit was already ongoing.

12                   THE COURT:  Well, nonexclusive license to

13   Delaware means that Delaware itself can't bring a claim,

14   right?

09:18:28  15                   MR. WEBER:  Well, that's correct here, because

16   they took subject to the prior license.  Delaware

17   acknowledged --

18                   THE COURT:  If your colleague wants to make

19   the argument have her make the argument.  Don't have her

09:18:44  20   sitting there kind of making the argument for you by

21   parroting it through you.

22        So if she wants to make the argument, she's the one in

23   charge of this and knows the case better, have her make the

24   argument.  So I'm not going to listen to two people making

09:19:00  25   the argument, so one or the other, you make the argument.

1        But if she's not making the argument, then you sit

2   back and let her make the argument.

3                MR. WEBER:  All right, I will.

4                MS. GENTILCORE:  With your permission, Your

09:19:14  5   Honor.

6        The difference is it was a nonexclusive license.  In

7   the other case, they did not give enough to Delaware that

8   Delaware -- Delaware took, subject to the existing ownership

9   of North Carolina and the existing license to North Carolina

09:19:36 10   to Lowe, they take --

11                THE COURT:  That's true in all these cases,

12   isn't it?  That was true in the -- that was true in *the*

13   *Microsoft* case, right?

14                MS. GENTILCORE:  It's true to the extent that

09:19:48 15   they look at them to see what was retained.  And in that

16   case, in those cases, all of the rights were given over.

17        In this case, all of the rights were not given over.

18   It was a nonexclusive license.

19                THE COURT:  Who had the right to sublicense?

09:20:07 20                MS. GENTILCORE:  Who has a right to sublicense

21   now?

22                THE COURT:  Yes.

23                MS. GENTILCORE:  I believe it is Delaware, but

24   only to the extent that --

09:20:20 25                THE COURT:  Okay.  Is there any conditions in

1    the contract with Delaware restricting who Delaware can

2    sublicense to?

3            MS. GENTILCORE:  There is a restriction,

4    because they cannot -- it's not to whom they can, it's a

09:20:34  5    restriction of what they can.

6        They cannot give -- North Carolina did not give more

7    to Delaware than it has -- or Delaware took subject to North

8    Carolina's continuing right, continuing right to make, use,

9    and sell.  They didn't give those up.  It's a nonexclusive

09:20:55 10    right.  It's a nonexclusive license.  They didn't give those

11    up.

12        They are co with Delaware.  North Carolina can make,

13    use, sell, and offer for sale.  They did not give those

14    rights up because it was a nonexclusive license.

09:21:10 15        And what happened in the license agreement with

16    Delaware is they acknowledged only one thing.  They

17    acknowledged that when it comes to the right to pursue the

18    litigation, Lowe shares that right with North Carolina.

19    North Carolina did not give up that right.

09:21:31 20            THE COURT:  Okay.  Does the defendant have any

21    response?  And then I'm going to move on.

22            MR. SHEIKH:  I do, Your Honor.  I want to make

23    a few points, because I've heard a few things that simply

24    aren't true.

09:21:42 25        First of all, you hit the nail on the head, Your

1    Honor.  You went right to the assignment, and the

2    assignment, in the assignment, they/Lowe assigned all causes

3    of action.  All causes of action, everything assigned.

4    That's number one.

09:22:03  5    Number two, there's some suggestion here that Mr. Lowe

6    has a license-back, a license.  He doesn't have a license,

7    he has nothing.  There's no document here.  And again, the

8    North Carolina-Delaware transaction, Mr. Lowe was not a

9    party to that.  He was not a party to that.  He assigned in

09:22:25  10    a publicly-filed document all rights and kept nothing.

11    Third, Your Honor, I think something is being missed

12    here, is that in this case how is Your Honor, in this

13    rhetorical question, how is Your Honor going to enter a

14    final judgment.  It can't be done because they have

09:22:49  15    conceded, they have said that their rights in this case are

16    limited to damages that accrued only up until December 15,

17    2021.  The patent doesn't expire until April 2026.  Their

18    rights stop.

19    We're now eight months past what they are seeking in

09:23:08  20    this lawsuit.  ShieldMark, the defendants, they are

21    continuing to practice, to sell the invention.  And so there

22    is -- there's no way a final judgment can be entered here

23    and the Federal Circuit has recognized a policy on this,

24    that you can't separate the right to a cause of action from

09:23:28  25    the right to exclude for this reason:  We face untold,

1    unidentified additional lawsuits, exposure, claims, because

2    of this.

3         I also mentioned, and the Supreme Court case by Chief

4    Justice Taft is directly relevant here, of course it's a

09:23:49 5    Supreme Court case; our case is even stronger for no

6    standing because of the fact that they have said that their

7    rights under this patent against us -- and that's all that

8    matters, it's us -- only extend to the right to pursue

9    damages to December 15, 2021.

09:24:12 10        So in that regards, even stronger because here we have

11   an additional patent term left, and they're saying, well, we

12   don't have rights there to exclude you from doing that.  In

13   fact, I don't even know who has the rights to do that,

14   nobody does.

09:24:29 15        So you can't enter final judgment here in this case,

16   there's no standing.  Your Honor has gone right to the heart

17   of it by asking the questions you did of plaintiffs, which

18   you know, again, the answers I think confirmed it.  There's

19   no standing here, Your Honor, there's no right to exclude.

09:24:46 20   They separated the right to exclude, which is essential to

21   the patent, from a cause of action for damages.

22        The Supreme Court --

23             THE COURT:  In this case, with the

24   nonexclusive to Delaware, does anybody have the right to

09:25:03 25   exclude?

1           MR. SHEIKH:  That's exactly right, Your Honor.

2      The answer to that question is, no.  They only have an

3      option, so I don't think there is the right to exclude.

4           I will say this, also.  The plaintiffs keep pointing

09:25:18  5   to the fact that it was a nonexclusive license given and

6      latching onto that, but the Court has repeatedly said you

7      don't look at the title or labels applied to these rights.

8      You've got to look at the substance.  You've got to look at

9      what actually happened here.

09:25:35 10        And when you look at what actually happened here, I

11     don't care what they call it, it doesn't matter.  What

12     actually happened here is that they -- all substantial

13     rights, all exclusionary rights are gone from the plaintiffs

14     in this case.  Where they are, we can't say, Your Honor.

09:25:52 15   You're making a good point.  We can't say.

16          So because of that, we can't have a final judgment in

17     this case, and there's just no right to pursue this case.

18     It ended on December 15, 2021, Your Honor.

19               THE COURT:  All right.  Let's turn to the

09:26:11 20   invalidity.  There's basically two somewhat distinct

21     arguments on the invalidity.  One is that the

22     specifications, that the plaintiff had not sufficiently --

23     under the plaintiff's version they had not given specific

24     information to embody the patented invention, and I to some

09:26:47 25   degree understand the plaintiff -- or the defendant to make

1    the argument that the specifications are intended to both

2    enable a third party skilled in the art to create the

3    patented article, but also that the specifications can place

4    some limits on the scope of a claim if the scope of the

09:27:17 5    claim exceeds the specification.

6         Is that generally your embodiment argument?

7              MR. SHEIKH:  Yes, Your Honor.  You have the

8    written description requirements of Section 112 and the

9    enablement requirement.

09:27:33 10        Our argument focuses on primarily on the written

11    description requirement, which requires correspondence

12    between the specification and the claims, correct.

13              THE COURT:  The second argument you make is

14    that if accepted under the Federal Circuit's claim

09:27:49 15    construction.  That the earlier art together with I believe

16    the Dorenbusch patent disclosed or anticipated the patent in

17    this case.  Do you want to make -- why don't you begin with

18    disclosure requirement in the specifications argument, and

19    then follow that with whatever argument you want to make on

09:28:24 20    the Dorenbusch or the Durastripe.

21              MR. SHEIKH:  Yes, Your Honor.  Thank you.

22         I will start with the written description requirement,

23    that's 35 U.S.C. Section 112.  And as I mentioned, it

24    requires a correspondence between the scope and content of

09:28:45 25    the written description, including what's written in the

1    drawings and the claims.  And that correspondence requires

2    that the scope, the meaning and scope of the claims, cannot

3    be inconsistent with or broader than the scope and content

4    of the specification.

5        THE COURT:  On this argument, do you likely

6    lose with regard to the shoulders, given the Federal

7    Circuit's opinion?

8        MR. SHEIKH:  Yes, Your Honor.  The Federal

9    Circuit --

10        THE COURT:  So on this specifications, is that

11    principally related to the underside of the tape?

12        MR. SHEIKH:  Correct, Your Honor.  The Federal

13    Circuit, the issue before the Federal Circuit, and you've

14    got to remember this was an appeal from a stipulated

15    judgment of noninfringement based on Your Honor's claim

16    construction, and that with respect to what you just asked

17    about the issue was we had argued to the Court and the Court

18    agreed that several claim terms required the presence of

19    shoulders on the bottom.  And that was our claim

20    construction, the use of the word "shoulders."

21        That was appealed to the Federal Circuit and the

22    Federal Circuit disagreed.  The Federal Circuit held that

23    the claims as properly construed did not require shoulders.

24    That's what was decided.  And for that reason, the judgment

25    of noninfringement was vacated and the case was remanded.

1          THE COURT:  Did they make any ruling on the

2     underside as to whether the patent claims sufficiently

3     disclosed an underside able to hold the adhesive?

4          MR. SHEIKH:  No, Your Honor, they didn't.  In

09:30:47 5     fact, and that goes back to what was actually before the

6     Federal Circuit, it was a stipulated judgment of

7     noninfringement.

8          And so the issue of validity, which is Section 35,

9     U.S.C., Section 112, the written description requirement,

09:30:59 10    that issue of validity was not before the Court.  In fact,

11    that issue was dismissed without prejudice before the

12    appeal.

13         So the Federal Circuit did not consider, much less

14    rule on, whether the scope and content of the written

09:31:18 15    description would support to one skilled in the art a scope,

16    a claim scope that has no structure, nothing on the bottom,

17    flat.  That was not determined.

18         And so on remand, now, you know, we said, we had said

19    as Your Honor will remember, virtually from the beginning of

09:31:38 20    the case, that the plaintiffs can't have it both ways.  That

21    if they're going to apply these claims to a product that's

22    got a flat bottom that it's maybe those claims would cover

23    the accused product, you know, they could make that

24    argument; but you have to look at the other side of the

09:32:00 25    coin.  That would render them invalid because of the written

1     description requirement.

2          We said that from the beginning of the case.  That

3     came to fruition when the Federal Circuit made its decision.

4     The Federal Circuit went with, they agreed with the

09:32:16  5     plaintiffs, they adopted their position on this claim scope

6     that it would encompass a flat bottom.  They got what they

7     wanted.

8          Now it's back before Your Honor.  We're going back to

9     what we said in the beginning of the case.  They got what

09:32:29  10    they wanted, but here, let's look at the other side of the

11    coin.  They don't like the other side of the coin.  They

12    don't want you to look at the other side of the coin.  They

13    They're saying the other side of the coin doesn't matter

14    because that was already resolved by the Federal Circuit,

09:32:42  15    and it wasn't.

16          And now we've got to consider the scope and content of

17    the written description from the perspective of a person of

18    ordinary skill in the art.  The only evidence on that

19    subject comes from us, and it demonstrates that the claims

09:33:01  20    to the extent they're considered to be totally flat don't

21    correspond with the written description.  The written

22    description requires something on the bottom of this tape.

23          So that, Your Honor, is our position on written

24    description.  Unless you have any questions, I'm happy to

09:33:19  25    answer them; otherwise I'll turn, as you said, to the other

1    invalidity position in this case which has to do with the

2    anticipation based on prior art.

3         So --

4                   THE COURT:  Wait just a second.

09:33:32  5                   MR. SHEIKH:  I'm sorry.  I'm sorry, Your

6    Honor.

7                   THE COURT:  Okay.  Why don't you go on.

8                   MR. SHEIKH:  Thank you, Your Honor.

9         So turning to the issue the second invalidity position

09:34:32  10   in this case on our summary judgment motion, we've got --

11   I've identified three independent bases for invalidating all

12   the asserted claims of the '664 patent based on prior art,

13   and that consists of the Durastripe tape, the Dorenbusch

14   patent, and the Great Britain patent.  And let me set the

09:35:02  15   stage for this --

16                   THE COURT:  Let me ask, the Great Britain

17   patent, was that ever mentioned in the pleadings before?

18                   MR. SHEIKH:  In the pleadings?  I believe it

19   was, Your Honor.  I believe in our -- and I will go back and

09:35:20  20   look at this and confirm it for Your Honor, but I believe

21   that in our answer and counterclaims, Your Honor -- they've

22   been amended -- we had identified prior art including

23   Dorenbusch and Durastripe, and I think among the prior art

24   identified I believe the Great Britain patent is identified.

09:35:40  25   It's certainly was put into our invalidity contentions under

1   local patent rules.  Clearly it was part of that, and it's

2   been part of the expert reports.

3       If you're asking about the pleadings and if you mean

4   the counterclaims, I believe it was, but I can go back and

09:35:59  5   confirm that, if that's important.  But it was --

6               THE COURT:  I'm not sure whether it varies

7   much from the Dorenbusch.  Why don't you go ahead with

8   regard to either the Durastripe issue or the Dorenbusch

9   issue.

09:36:23  10              MR. SHEIKH:  Yes, Your Honor, I'll focus on

11   those two.

12              THE COURT:  So those deal -- is the principal

13   element of disagreement on that is whether the Durastripe

14   lateral edge anticipated the plaintiff's patent?

09:36:46  15              MR. SHEIKH:  Well, I think to be honest with

16   you, Your Honor, I think the only dispute -- I think from

17   the matter of claim coverage with -- and you're talking

18   about Durastripe, that there is no dispute.  There is no

19   dispute.  That -- we identified a --

09:37:09  20              THE COURT:  Is Durastripe the one you contend

21   they admitted was similar, but is Durastripe the prior

22   implementation that involves whether it was within the

23   period before the patent application?

24              MR. SHEIKH:  Yes, Your Honor.  Durastripe is a

09:37:33  25   physical tape.  It's a physical tape that we've identified

1    and that physical tape is called Durastripe.  It was a

2    product.  Nobody disputes, nobody in this case has ever

3    disputed that Durastripe is prior art.  Everybody -- and in

4    fact on that basis, throughout the case, we've identified

09:37:55  5    requests for admissions in our submissions that most

6    of -- just from the perspective of Durastripe, elements were

7    flat out admitted.  There's no dispute.

8        And the belt and suspenders to that, we've identified

9    in our claim chart that Your Honor asked us to submit, we've

09:38:16 10    shown where it is.  There's been no dispute.

11        What has happened is in our summary judgment motion we

12    pointed to a Durastripe tape, and for the first time in this

13    case, three years, they made the assertion, well, wait a

14    second, that they haven't identified a dated Durastripe

09:38:41 15    tape.  That was out of left field, because nobody had

16    disputed that Durastripe -- and we identified this tape at

17    the beginning of the lawsuit.

18        So that is the only dispute, if there is one, and I

19    contend there isn't one, and I can explain in a minute.

09:38:57 20        But as far as how the claims apply to that tape that

21    we've identified that we put -- this is the tape, Your

22    Honor, if you'll remember, when you reconvened us on May 25,

23    I believe it was, you asked us to pull out the answer and

24    counterclaims.

09:39:17 25        And you wanted to refresh your memory about the case,

1    and you had directed the parties and, said, well here in the

2    answer and counterclaims there's a Durastripe tape, and is

3    that what one of the things you contend invalidates the

4    patent.  We confirmed that for you "yes."  Well, that

09:39:33  5    Durastripe tape that was there that you identified, that's

6    what we identified in our summary judgment motion.

7         There is no evidence in this summary judgment record

8    that that tape lacks any element of any of the asserted

9    patent claims.  What the defendants -- I'm sorry -- what the

09:39:51  10    plaintiffs have done, the only thing they have done is, one,

11    they've said, well, you've got to identify a dated version

12    of that, which we have; and second, they have engaged in

13    this misdirection which has happened throughout the case,

14    and I want to clear it up here now, Your Honor.  They -- and

09:40:10  15    they continued in their submission Friday, this rebuttal

16    report they submitted.

17         All they have told Your Honor is, Your Honor, look at

18    the dyes and the process used to make Durastripe.

19         Well, that's different from my viewpoint.  Those are

09:40:26  20    different processes.  Look how the dyes are different, look

21    how the processes are different.  That's not true.

22         But more importantly, more fundamentally, it doesn't

23    matter, Your Honor.  This patent is directed to a physical

24    object, the tape.  The only issue before Your Honor on

09:40:42  25    summary judgment is whether we've identified a prior art

1      piece of tape, Durastripe, that has all the elements.

2          The misdirection about what the dyes are, what the

3      process is, that may be useful for other aspects of the

4      case.  It doesn't matter.  We need to look at the physical

09:41:00  5      tape and does it include each and every element of the

6      asserted claims.

7          And Your Honor, if you look at the summary judgment

8      record with respect to that piece was tape you are not going

9      to find anything from them that contradicts what we put in

09:41:15 10      our claim chart.  Each and every element is there, every

11      one.  They have said in their filing, I did notice, and

12      something to the effect that they have disputed that the

13      lateral edge isn't there.  There's a request for admissions

14      on this very topic where they admitted that it's there.

09:41:35 15          So I don't quite understand where that's coming from.

16      The request for admission is, "Admit that Durastripe tape

17      had a body that had first and second lateral edge portions

18      disposed in a longitudinal direction."  "Response:  Admit."

19      That's Exhibit 13 at page ID3878.

09:41:58 20          Couldn't be clearer.  So for them to come in now and

21      throw that into their supplemental brief isn't going to save

22      them.  That's admitted, and moreover, there's just nothing.

23      The only thing they've been able to do on that tape is to

24      talk about the dyes and the process.

09:42:22 25          We've also, with respect to its prior art status, Your

1   Honor, we have a declaration of Tom Goecke that we include

2   in the summary judgment record where he says, he points out

3   its prior art.  That's consistent with everything that

4   happened in the case, they never contested it.

09:42:41  5       When we saw that in their filing we wanted to leave no

6   stone unturned here.  We've come too far.  Your Honor has

7   come too far.  We've put too much into this case.  So we

8   submitted -- we went out and got the declarations of

9   Mr. Nye, Mr. McHale, to just put that whole idea to rest,

09:43:01  10  leave no doubt.

11       We didn't need to do that, and frankly, Your

12  Honor -- but under Rule 56(e) that's exactly why we have

13  that rule, is to avoid that, because we can't have a trial

14  where this issue really is in dispute.  So that's what we

09:43:20  15  did there.

16       So unless Your Honor has some questions about

17  Durastripe --

18              THE COURT:  Let's let counsel for the

19  plaintiff respond.

09:43:29  20              MR. SHEIKH:  Yes, Your Honor.

21              THE COURT:  I didn't draw this out from the

22  defense to any major degree, but how do you distinguish the

23  Dorenbusch patent, this kind of athletic tape that goes

24  into -- that predated your patent.

09:44:01  25              MR. WEBER:  Well, again --

```
 1              THE COURT:  It had a flat bottom, right?

 2              MR. WEBER:  Dorenbusch does indicate that it

 3   has a flat bottom, although the flat bottom has a crosshatch

 4   pattern on it, or whatever, to keep it from sliding --

 5              THE COURT:  Yeah, but that's not part

 6   of -- that's not part of the claim limitation, right?

 7              MR. WEBER:  No, no.  I was just stating what

 8   Dorenbusch had.

 9              THE COURT:  Okay.  So it's got a flat bottom

10   and it's got kind of an edge then.  How do you distinguish

11   the Dorenbusch patent -- how does it not anticipate the

12   '664?

13              MR. WEBER:  Well, for a number of reasons.

14   All of the claims of the '664 patent require that the upper

15   surface of each lateral edge portion comprises an extension

16   of the upper surface of the body.  That's not present in

17   Dorenbusch.

18        Dorenbusch -- pardon?

19              THE COURT:  Well, can you -- the edge portion,

20   it's part of the same general surface.

21              MR. WEBER:  But -- I'm sorry, Your Honor.

22              THE COURT:  Doesn't it have basically a flat

23   top and then it gets towards the edge and then has a

24   bevelled edge going down to the floor?

25              MR. WEBER:  It does have that, but it doesn't
```

1   have the upper surface of the lateral edge portion

2   comprising an extension of the upper surface of the body.

3   That feature isn't present.  Those are sharply cut,

4   sharply-cut edge portions.  You look at them, they come

09:46:14   5   down, it isn't an extension.

6        You're talking about looking at an appliqué or

7   whatever you're going to put on the floor that has a top

8   surface, a bottom surface, and uniquely-defined edge

9   portions which are not extensions of the upper surface of

09:46:37  10   the body.  Every word in the claim is important.  They're

11   claiming this as an anticipation, and that's simply not the

12   case, at least for there.  You just look at the title of the

13   invention.  The title is "Temporary rearrangeable marking

14   system."  We are not talking about or claiming a temporary

09:47:05  15   rearrangeable marking system.

16             THE COURT:  But that's not one of the elements

17   that the circuit had, is it?

18             MR. WEBER:  Yes.  It's supposed to be adhered

19   to the floor to limit lifting and that.  That's a limitation

09:47:23  20   of the claim.  And yet these here are intended to be easily

21   lifted, taken away, put down the next time you have a

22   practice, or whatever.  You know, that's not -- that doesn't

23   satisfy that claim language.

24        You wouldn't look -- a person skilled in the art would

09:47:51  25   not look to Dorenbusch for assistance in designing a marking

1    tape for an industrial floor that's going to resist lifting

2    that's going to be adhesively adhered, and the adhesive

3    for -- as Dorenbusch discloses is an option.  You know, you

4    may need it, and not to prevent or to limit lifting from the

09:48:20  5    floor, but to prevent it from -- if I might -- prevent it

6    from sliding.  That's what Dorenbusch is talking about.

7        So you know, there's certainly a difference.  In fact,

8    they're saying it's for the nonslip characteristic.  It's an

9    adhesive with a low degree of adhesion so as to not make it

09:48:45 10    difficult for the spot markers removal from the surface,

11    which in fact is the antithesis of the --

12            THE COURT:  Take a look at the Dorenbusch

13    patent at column 3, line 15 and 16.  Does it teach the thin

14    layer of adhesive can be applied to the underside of the

09:49:27 15    maker?

16            MR. WEBER:  Yes.  I just said that.  And the

17    adhesive enhances the spot marker's surface nonslip

18    characteristic.  An adhesive with a low degree of adhesion

19    is used so as not to unduly make difficult the spot marker's

09:49:45 20    removal from the surface.

21        That's the antithesis of what we want.

22            THE COURT:  They talked in the Dorenbusch

23    about applying an adhesive to the bottom of the tape, right?

24            MR. WEBER:  Again, yes.

09:50:14 25            THE COURT:  Well, how does that not anticipate

1        the adhesive that you're speaking about?

2                    MR. WEBER:  It does not limit unintentional

3        lifting of the floor, marking tape from the floor.  They

4        come around and lift this stuff up and take it away.  They

09:50:39  5   express --

6                    THE COURT:  Your tape, isn't one of the

7        selling points that you can move these around and you

8        can -- they're not permanent and you can also pick them up?

9                    MR. WEBER:  Not our tape.

09:50:57 10                   THE COURT:  Well, one says permanent.

11                   MR. WEBER:  No.

12                   THE COURT:  Once it's applied does it remain

13       there forever?

14                   MR. WEBER:  Well, they've brought in tape that

09:51:08 15   is the accused tape that they say has been down on a floor

16       for 20 years.  I would say that that's pretty permanent.

17           It can be removed, but it's not removed and reused --

18                   THE COURT:  Well, how -- the Dorenbusch, how

19       is that significantly different -- or how does Dorenbusch

09:51:31 20   not anticipate --

21                   MR. WEBER:  It's significantly --

22                   THE COURT:  -- if both of them can be removed

23       even with differing levels of effort required to do the

24       removal?

09:51:42 25                   MR. WEBER:  You need to read the claim.  I

1        don't mean "you," I apologize for that.  You, a corporate

2        "you," a person needs to read the claim in its full context,

3        but --

4                     THE COURT:  Well, let's go -- the claim itself

09:52:07  5     describes each of the first and second lateral edge portions

6        having a maximum height that is less than the width

7        and -- and I think this is where you're going -- an adhesive

8        securing the lower surface of the body to the upper-most

9        surface of the floor to establish a boundary.

09:52:28 10                  MR. WEBER:  No.  I was over at claim 11, Your

11       Honor.  Down near the bottom, the first and second junctions

12       disposed on the upper-most surface of the floor such that

13       the floor marking tape limits unintentional lifting of the

14       floor marking tape from the floor.

09:52:48 15                  THE COURT:  I still am kind of lost how that

16       differs from Dorenbusch's suggestion that you might use

17       adhesive.

18                     MR. WEBER:  Because you have to read what

19       Dorenbusch says.  Its for is to keep it from slipping.

09:53:08 20                  THE COURT:  I thought the bottom of Dorenbusch

21       was textured to try to keep the slipping to a minimum.

22                     MR. WEBER:  That's right.  And then it says in

23       the part you had me read, enhances the spot marker's surface

24       nonslip characteristic.  The adhesive enhances the spot

09:53:30 25     marker's surface nonslip characteristic.  That's what

1    they're talking about.  It doesn't anticipate this.  It

2    doesn't satisfy, you know, that requirement of the claim.

3                    THE COURT:  Well, if Dorenbusch tells users

4    that they can make the tape less likely to be picked

09:54:02  5    up -- or to be, you know, interfered with by putting some

6    adhesive on the bottom of it, does that anticipate the

7    adhesive that you suggested with the '664?

8                    MR. WEBER:  Does that anticipate -- no, it

9    doesn't anticipate it.  And again, you have to read the

09:54:36 10    entire claim language.  They're talking about slipping and

11    easily removable, and then you can use it again tomorrow and

12    put it in a different places.  That isn't what this

13    invention is about.  It isn't about what the accused product

14    is about.  If they had wanted to use this type of an

09:55:04 15    adhesive on their product we wouldn't be here, Your Honor.

16                    THE COURT:  Okay.  Let's go to the -- to the

17    Durastripe argument.  How are they different?

18                    MR. WEBER:  Well they're totally different,

19    Your Honor.  You know, Mr. Lowe used to sell the Durastripe

09:55:25 20    product.  We actually have unused samples of the Durastripe

21    product from the time in interest to today, and they don't

22    have tapered edges.  They have edges that are either

23    bullnose, in other words, they come down very much

24    vertically, they round off and come down very much

09:55:51 25    vertically, or they're duckbilled, which means that the top

1      comes down a little and the bottom comes up a little, but it

2      doesn't lie on the floor, it doesn't prevent the Towmotors

3      or skids or pallets or anything from lifting.

4                     THE COURT:  Let me deal with the second part

09:56:11  5      of that.  The duckbill, so did the -- the Durastripe was

6      intended to be a floor marking tape, right?

7                     MR. WEBER:  Yes.

8                     THE COURT:  So if it -- and so even if it's

9      duckbilled, would the underside of the duckbill, if there

09:56:47 10      were such a duckbill, wouldn't that actually adhere to the

11      floor anyway?

12                     MR. WEBER:  It might adhere to the floor until

13      a pallet came across it and that duckbill is lifted up.

14      That's exactly what this invention was about, and that's

09:57:04 15      what the claims say.  It's down on the floor.  It comes

16      down.  The junctions hit on the floor.  You can take the

17      product that -- the Durastripe product that we still have or

18      that Mr. Lowe still has, you can put it down and you can

19      take a credit card out of your wallet and slide it under,

09:57:30 20      and that certainly doesn't satisfy this claim.

21             And another very important, very important aspect

22      here, Your Honor, is that not only do we have the product, a

23      contemporaneously product which they apparently don't have,

24      and they purportedly didn't have it 12 years ago when we

09:57:53 25      were involved in a suit with them then when they were suing

1    us, but we have it.  We have that product.

2        And we also note their patent, Mr. Goecke's patent on

3    his product, and his patent does not show a tape with any

4    tapered edges.  Although he said he's always made his tape

09:58:16  5    with tapered edges, it doesn't show, mention, describe,

6    suggest, even hint to the desirability of having tapered

7    edges.  And that was on the product that he was then

8    selling, this Durastripe product.

9        And as I'm sure Your Honor knows from patent cases,

09:58:40 10    you're required to show your best mode and preferred

11    embodiment or the best mode of your invention in your

12    patent.  His patent is devoid of any suggestion of that.

13    And --

14                    THE COURT:  Was the Durastripe under a patent?

09:58:59 15                    MR. WEBER:  I'm sorry?

16                    THE COURT:  You're confusing me with some

17    discussion of a 12-year-old patent that predates.  Is that

18    the patent that was used for the Durastripe?

19                    MR. WEBER:  Yes -- right.  It's the patent

09:59:13 20    that, remember, that was marked on the Durastripe product.

21    The patent number that's marked on the Durastripe product

22    does not have tapered edges.  That patent would have been

23    unenforceable from the get-go because it didn't disclose or

24    treat or address the best mode, if in fact, if in fact they

09:59:37 25    had tapered edges.

1          But if Your Honor, if Your Honor would indulge me, if

2     you would look at the expert report of Jim Frankland, the

3     supplemental expert report that -- rebuttal expert report, I

4     should say, that was recently filed, you know, he has

09:59:57 5     described it absolutely correctly; that what they were

6     attempting to make was a tape with bullnose on both sides

7     because the bullnose is vertical, just like what they show

8     in their patent.  They didn't have -- they didn't have this,

9     they didn't advertise it, they didn't promote it, and they

10:00:19 10     didn't warranty for it.  They wouldn't warranty for it.

11          THE COURT:  I'm still kind of -- they've shown

12     this die that doesn't show a bullnose, but their suggestion

13     is there may be some variation among manufacturing, and as

14     you exclude this materials maybe some had more of a

10:00:43 15     bullnose, maybe some had less; but that the issue I thought

16     they were arguing was that the test on prior art was whether

17     there was any out in the commercial market that had edges

18     that were -- that read on; just that you have, not that

19     everyone had, only that at least someone in the commercial

10:01:16 20     market did.

21          MR. WEBER:  And you're right, Your Honor.  I

22     have apologize.  You're right, and we're saying there

23     weren't any.

24          And Your Honor, if I might, just to step back a little

10:01:29 25     bit --

1          THE COURT:  Let me go back.  How would your

2     expert know, he can make a comparison, you know, for among

3     two different samples, but how would he have knowledge to

4     testify as to what all the other manufacturing runs were?

10:01:54  5          MR. WEBER:  Because he can tell by looking at

6     the die.  And it's very interesting that they're saying now

7     don't look at the die, don't look behind the curtain, don't

8     look at the die.  And if you'll remember, they brought a die

9     to our first meeting with the Court.  And they showed the

10:02:14 10    Court that die, and that die, according to our expert, when

11    run will because the tapered edges are cantilevered out,

12    they're hot, they're molten, and they're unsupported because

13    their cantilever will fold down as they exit the die and

14    they begin to cool and shrink, they'll fold down, and

10:02:41 15    they'll make the vertical edge that is shown in their

16    patent.

17         And if they had one that had a tapered edge that met

18    our claims out of Durastripe that would have been a real

19    anomaly.  That would have been a real anomaly.

10:03:01 20         THE COURT:  And then finally, with regard to

21    the embodiment, do you have any more argument with regard to

22    the underside as to whether you sufficiently described that

23    and whether the specifications, whether the specifications

24    you gave sufficiently read on the claim you're making?

10:03:26 25         MR. WEBER:  Yeah.  It's -- I want to be

1    careful how I say this, and I mean that.  But once again,

2    we're addressing things as though they're in a claim that

3    aren't in a claim.

4         The claim doesn't talk about whether the bottom is

10:03:47  5    flat -- I mean whether the bottom is continuous,

6    discontinuous, whether it has shoulders, whether it has a

7    recess, or whether it's just totally flat.  The claims don't

8    talk about that.

9         But the specification, as Mr. Haas, their expert,

10:04:04 10    aptly noted in his expert report --

11              THE COURT:  Let me -- your argument is fairly

12    confusing.  Do your specifications point out an underside

13    able to absorb the adhesive material, basically a channel

14    under the tape?

10:04:33 15              MR. WEBER:  "Absorb the adhesive material."

16    I'm not --

17              THE COURT:  Confine or hold the adhesive

18    material under the tape.

19              MR. WEBER:  One embodiment does, Your Honor.

10:04:47 20    One embodiment.

21              THE COURT:  Okay.  So almost all of the

22    drawings show that?

23              MR. WEBER:  The drawings but not the claims,

24    Your Honor.  And --

10:05:00 25              THE COURT:  Let me -- and I think I understand

1    what you're saying.  The claims I thought, and the defendant

2    can correct me if I am wrong, I thought their argument was

3    that claims can be interpreted broader than specifications,

4    but that because of the embodiment requirement that there

10:05:32  5    still needs to be a confluence between the specifications

6    and the claims so that somebody would know how to create the

7    patented article.

8                    MR. SHEIKH:  If you're asking me, Your

9    Honor -- this is Dave Sheikh with the defendants.

10:05:54 10         If you are asking did you get that right, you did, and

11   Mr. Weber is making the argument for us.  He said, yes, the

12   specification says what Your Honor says it does, that

13   there's got to be something on the bottom, but the claims

14   don't.  That's the problem.  That's why the claims are

10:06:11 15   invalid.  That's exactly right.

16                    MR. WEBER:  It doesn't say --

17                    THE COURT:  Mr. Weber, if the claim is broader

18   than the specifications, how does somebody know how to

19   embody the patent?  Do they follow the specifications or do

10:06:39 20   they follow the claim?

21                    MR. WEBER:  The claims are a part -- the

22   original claims are part of the specification, Your Honor,

23   and they follow, they follow either.  But someone, as the

24   Federal Circuit noted I think five or six times in its

10:07:00 25   decision, the specification describes various embodiments of

1     the tape, several without shoulders.  So it's telling the

2     person skilled in the art reading, if you want to make one

3     without shoulders, make it without shoulders.  If you want

4     one with a recess to cabin the adhesive, as the Court has

10:07:27    5     stated, make one with a recess that will cabin.  But --

6               THE COURT:  Where did they say that about the

7     underside recess?

8               MR. WEBER:  The underside what?

9               THE COURT:  Where did the Federal Circuit say

10:07:40   10     that about the underside recess?

11               MR. WEBER:  Well, at document 110, page

12     ID4911, they said, unquote, unlike the '664 patent claims,

13     the '290 patent claims expressly recite that the claim has

14     shoulders and the recess.  It says "the patent claims."

10:08:11   15          The specification describes various embodiments of the

16     tape, several without shoulders.  Document 110, ID4912, it

17     says, the specification goes on to describe additional

18     embodiments or configurations of tape, several without

19     shoulders.

10:08:41   20          It's saying the specification is doing this, as is

21     clear from the claim language and the specification.  That's

22     where I started off and Your Honor stopped me, even Haas

23     says there's five embodiments.  There's five embodiments in

24     this patent, and he goes through and talks about them.

10:09:04   25          A person skilled in the art, in fact, even the patent

1    says one of the features is that you have a tapered edge.

2    Another feature says that you have shoulders and a recess.

3    If you're interested in keeping it -- having a nice little

4    ramp down to the floor you use the tapered edges.  If you

10:09:26  5    want to cabin the adhesive you use the shoulders and the

6    recess.

7        A person skilled in the art, as the Federal Circuit

8    aptly noted, would know that you don't have to use all of

9    them, because he talks about five different embodiments.

10:09:46  10        THE COURT:  Where is the specification --

11    remind me, because I'm sure you know -- where is the

12    specification that says that you can have an underside

13    without any cavity of any type.  Which specification says

14    that or which drawing?

10:10:18  15        MR. WEBER:  Well, the claim says it.  It's not

16    saying --

17        THE COURT:  Is there any specification that

18    indicates that there is at least one version where there is

19    no distinction between the underside of the middle area and

10:10:46  20    the floor?

21        MR. WEBER:  Well, I know that Mr. Haas saw it.

22    Let me see.  Their expert saw it --

23        THE COURT:  We're going to pull this to a

24    close.  Why don't you take a look.

10:11:03  25        Do you have any rebuttal argument, Mr. Sheikh, on

1    either on the earlier argued Dorenbusch or the Durastripe?

2                    MR. WEBER:  If I might just for a minute, Your

3    Honor.

4        If you just look at the brief summary of the

10:11:24 5    invention, it talks about -- this is the first paragraph

6    under that in one configuration, and it talks about what's

7    there.  And in the next paragraph, and another --

8                    THE COURT:  Which line are you referring to?

9                    MR. WEBER:  I'm sorry, Your Honor.  Column 1,

10:11:43 10    we're down about halfway.  See "brief summary of the

11    invention"?

12                    THE COURT:  Yes, I see that.

13                    MR. WEBER:  All right.  So it sets out

14    different configurations.  Those are oftentimes referred to

10:11:56 15    as embodiments.  And in fact, I think Mr. Haas or Dr. Haas,

16    their expert, referred to them as embodiments.  He saw

17    different embodiments.  And some of those embodiments are,

18    you know, had to have the -- well, I mean, take a look a

19    minute here:  The lower surface adapted to face the floor.

10:12:23 20    Pair lateral edges disposed in longitudinal direction, and

21    adhesive disposed adjacent to lower surface of the body, and

22    the body have --

23                    THE COURT:  Using the term "adjacent" to the

24    lower surface, is that under the lower surface?

10:12:39 25                    MR. WEBER:  Well, I would imagine --

1          THE COURT:  The summary of the invention talks

2     about adjacent to the lower surface.  Does "adjacent" mean

3     under the lower surface or adjacent to the part of the lower

4     surface that's --

10:13:04  5          MR. WEBER:  I think -- it's on the lower

6     surface.  And then the next embodiment, notice that that

7     first paragraph didn't have -- didn't describe lateral edges

8     except that it has lateral edges.  But in the next --

9          THE COURT:  Let me bring you back, because

10:13:34 10    this -- I'm losing your argument.  In the "brief summary of

11    the invention," what part of that brief summary says that

12    adhesive would be put on the lower surface of the tape

13    without having any kind of structure to block the adhesive

14    from squirting out the edge of the lower surface?

10:14:09 15          MR. WEBER:  Well, the second paragraph

16    effectively says that.

17          THE COURT:  The one that begins, "In another

18    configuration"?

19          MR. WEBER:  Right.

10:14:30 20       The next one, the fourth one, doesn't -- it just talks

21    about the body having a glossy surface, and it talks about

22    that as being another configuration of the invention.

23          THE COURT:  Yeah, but do any of those say

24    anything about just simply putting the adhesive on the

10:14:54 25    bottom of the tape without some kind of barrier to stop the

1     adhesive from squirting out?

2               MR. WEBER:  No.  Normally you don't say about

3     what you exclude, Your Honor.  You don't say that in a

4     patent, why you exclude.

10:15:11  5         What we're saying is normal tape, normal tape just

6     like the tape shown in ShieldMark's original patent, has a

7     substrate and an adhesive on the bottom of it.  You know,

8     that's not rocket science.  You don't have to teach that to

9     a routineer in the art.  That's what the Federal Circuit

10:15:38 10   said, you know.

11              I don't want to go on.

12              THE COURT:  Mr. Sheikh, do you have any

13    concluding argument?

14              MR. SHEIKH:  I do, Your Honor.  I will try to

10:15:51 15   be brief.  There were just some points on all three of these

16    issues I can highlight.

17              Let me quickly, on the written description, I think

18    Your Honor has it.  I can tell from the questions that

19    you're focusing on the right thing, and look, the answer is

10:16:04 20   there's nothing.  As Mr. Haas said, and he said and his

21    conclusion was, to a person of skill in the art that the

22    scope of the teaching of that written description is that

23    you must have some structure on the bottom.  That was his

24    conclusion.  That is the only evidence of someone skilled in

10:16:20 25   the art on that topic, and that's the written description.

1          Let me address Dorenbusch.  I can really quickly do

2     that, because again that anticipates, that is unquestionably

3     prior art.  The document, the four corners of the document

4     make a disclosure, and you saw from the briefing that very

10:16:44 5     little is contested.

6               THE COURT:  What about he does contest whether

7     it was intended to be a permanent tape or one that would be

8     more easily removed.

9               MR. SHEIKH:  Correct, Your Honor.  And let me

10:16:58 10     point out that the patent, the Lowe patent itself recognizes

11     that the advantage of the tape is -- one of the benefits of

12     the patent tape is it can be lifted when a space is

13     reconfigured without excessive damage to the floor.  That's

14     in the patent at column 1, lines 5 to 27.  They talk about

10:17:20 15     advantages of the tapes like the invention.

16          Second, I will note that the claims don't say that the

17     tape is permanent or stays on the floor.  They say it stays

18     down unless it's unintentional, unintentionally taken off

19     the floor.  That's exactly what Dorenbusch is.  It is made

10:17:41 20     so it stays on the floor when you want it to be, and when

21     you don't want it to be it can be lifted intentionally.  You

22     can intentionally pull it off the floor.

23          The patent says, Dorenbusch says, it readily remains

24     in place without being dislodged.  It can be readily removed

10:18:00 25     when no longer needed.  It results lateral forces to remain

1    in place during use.  And it is a sufficient bulk and weight

2    to remain in place once properly positioned.

3         And Your Honor has also identified, which is something

4    that I identified, that the Dorenbusch patent expressly

10:18:22  5    teaches the use of an adhesive at the bottom.  So this is at

6    column 1, lines 44 to 47; column 1, line 55, 58; and column

7    2, 55 to 60 of Dorenbusch, all teaches this notion that it

8    stays in place unless it's intentionally lifted.

9         I'll also want to address one point that, first of

10:18:41 10    all, to anticipate something would be either express or

11    inherent, express or inherent; the only evidence of someone

12    skilled in the art says it's there, and that comes from us.

13    Everything is there.

14         Second, that he made the note that no -- Mr. Weber

10:18:54 15    argued that a person skilled in the art wouldn't turn to

16    Dorenbusch, which is incorrect.  First of all, Mr. Haas says

17    a person of skill in the art would; but second, if you look

18    at the Lowe patent itself, if you look at what Mr. Lowe

19    cited to the Patent Office during prosecution he cited U.S.

10:19:12 20    Patent 5,196,255 to Cohen, which is directed to an extruded

21    plastic slat, and during prosecution a U.S. patent

22    application 2009-0263610 to Yee for a glue-laminated bamboo

23    furniture.

24         So he himself recognized that someone skilled in the

10:19:35 25    art would look to something other than just strictly a tape.

1    He identified --

2                    THE COURT:  Do you have any concluding comment

3    or response on the Durastripe issue?

4                    MR. SHEIKH:  Yes, Your Honor.  First of all --

10:19:50  5             THE COURT:  If it's a bull end does it

6    anticipate the '664 lateral edges?

7                    MR. SHEIKH:  Well, I don't know what bull -- I

8    don't know what that means.  Nobody in this case except

9    possibly the plaintiffs know what it means.

10:20:05 10        I want to bring it back to what matters, Your Honor.

11   You heard nothing from Mr. Weber today and you heard nothing

12   in their briefs about that tape that we identified in our

13   Patent Office.  I don't know if it's  -- if they want to

14   call it bullnose, if they want to call it bullnose or

10:20:21 15   duckbill, call it any name they want, that tape has each and

16   every element.  They have not disputed that.

17                    THE COURT:  They're saying that their

18   invention, that it sounds like they're arguing that their

19   invention's salient feature was the kind of the

10:20:41 20   gently-sloping edge and the ability not to get pushed up by

21   the pallets or traffic over the edge of it.

22                    MR. SHEIKH:  Right.  And in our summary

23   judgment filing, our summary judgment filing, and you look

24   at what we filed in our claim chart that Your Honor asked us

10:21:02 25   to submit that identifies evidence, that element is there

1    front and center.  It's present in the tape we identified,

2    and they have not disputed that.

3         What you heard, what you keep hearing from them, it

4    is, oh, look at Mr. Goecke's patent, which was directed to

10:21:23  5    like entirely different features.  Look at the dies, look at

6    the molds.

7         Judge, they're telling you, we don't want you to look

8    at the actual product we identified in our motion.  Prior

9    art, Durastripe tape, that has exactly what you just asked

10:21:39  10    me about, and all the other elements.

11                   THE COURT:  Okay.

12                   MR. SHEIKH:  And that is the end of the case,

13    Your Honor.

14                   THE COURT:  Okay.  Let me --

10:21:48  15                   MR. WEBER:  Might I, Your Honor?

16                   THE COURT:  Let me ask the parties' input on

17    kind of a timing issue.

18         We hope to turn around decisions on this relatively

19    quickly.  If the plaintiff doesn't have standing the case

10:22:18  20    goes away, but there is this separate invalidity argument.

21         If the plaintiff doesn't have standing in this case,

22    what's the plaintiff's position as to, and the defense

23    position, relative to whether one decision should as an

24    alternative ground deal with the invalidity?  Because if the

10:22:51  25    plaintiff doesn't have standing, the case I assume gets

1    thrown out, but then there would be an opinion that the '664

2    is invalid.

3                    MR. SHEIKH:  Your Honor --

4                    THE COURT:  To some degree that would be *dicta*

10:23:14 5    or an advisory opinion.

6                    MR. WEBER:  We would be acceptable -- we would

7    find that acceptable, Your Honor, to do standing first.  We

8    think we're right on it, but we -- you know, I understand

9    where Your Honor is coming from.

10:23:39 10                    THE COURT:  What about the defense?  Because

11    I'm not sure myself which way to go on that, but --

12                    MR. SHEIKH:  Yes, Your Honor.

13                    THE COURT:  Because you've briefed and argued

14    both issues, and I believe we are pretty closely ready to

10:23:58 15    make a decision on both, but if there wasn't standing to

16    continue the lawsuit then --

17                    MR. SHEIKH:  Yes, Your Honor.

18                    THE COURT:  -- I'm not sure what impact any

19    judgment on validity would be.

10:24:15 20                    MR. SHEIKH:  Right.  I understand the issue

21    before the Court because standing is a gatekeeping issue,

22    and -- but I think in this situation we'd be open if Your

23    Honor is contemplating this, I think you have to rule on

24    standing first.  It's the gatekeeping.  You have to make a

10:24:33 25    decision on that, and we think that the case should be over

1   and ended based on that ruling.

2        But we would not object if Your Honor wanted to then

3   kind of provisionally go to the substance, if Your Honor

4   concluded that would be appropriate.  You know we would be

10:24:52  5   open to that.

6        I think that's all I can say.  The standing is a

7   jurisdictional matter, jurisdiction issue, and so that's

8   going to be addressed first, and we think we've made clear

9   that this case is over because of that.  But if Your Honor

10:25:09 10   were to address that, the substance, we would be open to

11   having that ruling.

12        THE COURT:  Well, I'm not certain myself,

13   because I thought I would ask for the parties' respective

14   positions on that.  I'm not sure how we'll deal with it one

10:25:26 15   way or the other.  It may be that the case survives and

16   we'll deal with the validity issue, or if the case goes out

17   on standing I may or may not deal with the validity issue.

18        Let me thank everybody for the argument today.

19        MR. WEBER:  Might I add one thing, Your Honor,

10:25:51 20   in response?

21        THE COURT:  Go ahead.

22        MR. WEBER:  Just with respect to Dorenbusch,

23   because I sort of thought we shifted gears too soon there,

24   Dorenbusch does not address the height and width of the

10:26:05 25   lateral edge portion relationship which is in every claim in

1      the patent, both independent claims -- well, at least

2      independent claims 1 and 11, and the claims dependent from

3      them doesn't address that, doesn't show that.  And most

4      importantly, it doesn't satisfy that, so it cannot

10:26:27  5      anticipate it.

6              THE COURT:  Okay.  I'm not sure that succeeds.

7      I've forgotten the exact percentages, but I thought it

8      talked about a range between 30 and 60 degrees.

9              MR. SHEIKH:  Your Honor, this is Dave Sheikh.

10:26:49  10        I wanted to raise two points if I could really

11     quickly --

12             THE COURT:  We're going to bring this to a

13     close.  If you want to quickly comment on that issue, but

14     we're not going to go back and forth.

10:27:00  15             MR. SHEIKH:  Right.  My other issue has

16     something to do with more procedural or timing, scheduling.

17     The issue on Dorenbusch I want to point, out you're

18     absolutely right that the patent expressly says that the

19     bevel is about 29 degrees.  That is the same exact -- that's

10:27:17  20     in the range of exactly what they accused of infringement.

21     I don't see how Mr. Weber, how they can argue --

22             THE COURT:  I had seen that before.  I'm not

23     sure.

24             MR. SHEIKH:  And Your Honor, the last issue

10:27:30  25     with your indulgence I wanted to raise is one of timing.  We

1      wanted to raise this, the notion.

2          Now we're on a schedule and we have a trial date I

3      think for September 19.  And given these issues that have

4      been raised, your standing which is subject matter

10:27:46  5      jurisdiction, and the issues, kind of many issues on

6      invalidity, we want to make a request -- this is something

7      we raised before -- that the Court continue the trial date.

8      And the reason is, the main reason --

9              THE COURT:  What's the plaintiff's position on

10:28:03 10      moving it beyond September, move it perhaps to October.  We

11      anticipate getting a decision out without any firm

12      commitment but we turn decisions out as relatively quickly.

13      But what's your position for the plaintiff on continuing the

14      trial date so both parties don't need to absorb a lot of

10:28:30 15      preparation expenses that may be well spent but may also be

16      wasted?

17              MR. WEBER:  I haven't discussed that with my

18      client, Your Honor.  I would like to --

19              THE COURT:  Why don't you speak, and if both

10:28:47 20      parties can confer among themselves, especially if there is

21      agreement to push back to avoid those expenses to suggest

22      some trial dates when you both may be available, say in

23      October or early November.  So if you can, come up with a

24      couple of suggested weeks if it does get continued.  And if

10:29:14 25      you're unable to get to an agreement on that, rather than do

1  this orally, I'd ask defendant to file a written motion.

2          MR. SHEIKH:  Yes, Your Honor.  We appreciate

3  that.

4          THE COURT:  Okay.

10:29:29  5          MR. SHEIKH:  And I want to know one thing so

6  it's clear here.  I also personally on September 19th have a

7  conflict.  I do, and I don't want to spring that on

8  Mr. Weber or the Court.  That goes into it, but our

9  fundamental reason is for what you said.  There shouldn't be

10:29:48 10  potentially unnecessary --

11          THE COURT:  Well, the basic question:

12  Marriage, divorce, or childbirth?

13      Okay.  We don't ask for an answer.

14          MR. SHEIKH:  I can explain it to the extent

10:30:08 15  necessary, but the primary reason --

16          THE COURT:  It's not necessary.  We don't

17  really even want to know.  But please confer among

18  yourselves, and then we'll take it from there.

19      Why don't you bump everybody out, and Nate, if you can

10:30:24 20  stay in, we'll stand adjourned on this.

21                  -  -  -  -  -

22      (Proceedings adjourned at 10:30 a.m.)

23

24

25

64

1

2

3

4

5

6                    C E R T I F I C A T E

7

8

9

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13             /s/ Heidi Blueskye Geizer    September 20, 2022

14             Heidi Blueskye Geizer                  Date
              Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25